# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

ORM HIENG,
    *Defendant-Appellant.*

No. 09-10401

D.C. No.
1:07-cr-00243-
OWW-2

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted
August 30, 2011—San Francisco, California

Filed May 11, 2012

Before: J. Clifford Wallace, Marsha S. Berzon, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Wallace;
Concurrence by Judge Berzon

**COUNSEL**

Edgar Eugene Page, Page & Page Attorneys at Law, Sacramento, California, for the defendant-appellant.

Benjamin B. Wagner, United States Attorney; Laurel J. Montoya (argued), Assistant United States Attorney, Fresno, California, for the plaintiff-appellee.

## OPINION

WALLACE, Senior Circuit Judge:

Orm Hieng appeals from his conviction and sentence (1) for conspiring to manufacture and distribute more than 1,000 plants of marijuana and (2) for manufacturing and cultivating, and aiding and abetting the cultivation of more than 1,000 marijuana plants. Hieng was convicted by a jury and sentenced by the district court to ten years' imprisonment, the minimum sentence under 21 U.S.C. § 841(b)(1)(A)(vii). Hieng moved for relief from the statutory minimum under the "safety valve" of 18 U.S.C. § 3553(f), but failed to persuade the district court that he had established the facts necessary to qualify for relief.

Hieng raises several issues in his appeal. First, he contends that the district court erred by allowing a law enforcement agent to testify regarding statements Hieng made through an interpreter during a post-arrest interview. He also argues that the district court erred in admitting testimony regarding the number of marijuana plants found at the property where he was arrested. Hieng contends further that the district court erred at sentencing in finding that Hieng had not truthfully provided all the information in his possession to the government, thereby resulting in the denial of safety valve relief. Finally, Hieng argues that cumulative error resulted in an unfair trial. We have jurisdiction under 28 U.S.C. § 1291. We affirm the conviction and sentence.

## I.

To the extent objections were preserved for appeal, we review the district court's evidentiary rulings for abuse of dis-

cretion. *United States v. Stinson*, 647 F.3d 1196, 1210 (9th Cir. 2011). We review evidentiary rulings to which no objection was made for plain error. *United States v. Chung*, 659 F.3d 815, 833 (9th Cir. 2011). On plain error review, we cannot provide Hieng relief unless he

> demonstrates that (1) there is an "error"; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings"; and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010), *quoting Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009); *see also United States v. Olano*, 507 U.S. 725, 731-37 (1993). We review the district court's factual findings at sentencing for clear error. *United States v. Real-Hernandez*, 90 F.3d 356, 360 (9th Cir. 1996). We will not disturb its findings unless they are without foundation. *United States v. Ajugwo*, 82 F.3d 925, 929 (9th Cir. 1996).

## II.

On August 28, 2007, detectives of the Fresno County Sheriff's Department discovered a large marijuana growing operation in a vineyard behind a residence in Fresno, California. They discovered marijuana plants growing among the grapevines in approximately fifteen to twenty rows in the vineyard. During the investigation, detectives also discovered marijuana plants growing inside the residence.

After discovering the marijuana plants in the vineyard, detectives saw a car leave the property, circle the area, and return to the residence. They stopped the car and found plant-growing paraphernalia on the driver, Lem Phin. As they

investigated the property, detectives found Hieng sitting in a chair under a tree outside the house. Inside the house, investigators discovered items of identification for both Phin and Hieng.

Fresno County Sheriff's Department detectives simultaneously eradicated and tallied the plants in the vineyard. Detectives who participated in the effort testified that they eradicated the plants by going up and down each row, pulling or cutting marijuana plants, and keeping a mental tally of the number eradicated. When they finished pulling plants in a row, they gave the plants to a member of the team who loaded them on a truck, and gave their tally to Detective Jensen. None of the detectives who testified remembered the actual number of plants that they had eradicated, but they testified that they gave the accurate number to Detective Jensen and saw him record the number they reported.

Detective Jensen testified that he kept an accurate tally of the plants he counted and of the numbers reported to him by the other detectives. He testified that he added all the tallies manually, verified his addition, and entered the final tally in his report. The final tally following this method was 1,039 plants growing in the vineyard and 70 plants growing inside the house, for a total of 1,109 plants.

The thrust of Hieng's trial defense was that he did not know that marijuana was being grown at the site. He testified that someone named Prasit had offered him $800 a month if he would sign the lease for the property and stay at the house at night. He testified that he never entered the vineyard and that he did not know there was marijuana inside the house because of his poor eyesight.

The government presented the testimony of Special Agent Kunkel of the United States Drug Enforcement Administration who testified that on July 2, 2008, he interviewed Hieng using an interpreter named Rithy Lim. Kunkel asked ques-

tions in English, which Lim translated into Cambodian. Hieng responded in Cambodian, and Lim translated the responses into English. Kunkel testified that, during the interview, Hieng denied that he knew there was marijuana in the house. He claimed that he could not see the marijuana plants because of his poor eyesight. Kunkel reported that when asked why he could not smell the marijuana, Hieng responded that small plants did not have an odor. Kunkel then asked how he knew there was no odor. Hieng answered that he had heard it from different people. When asked why another agent could smell the marijuana when he was in the house, Kunkel said Hieng responded that "it was like cigarette smokers. They don't smell the smoke, but non-smokers do." Kunkel also testified that Hieng said if he had known there was marijuana at the house, he would have charged more than $800 per month.

The government did not call the interpreter, Rithy Lim, to testify. On the first day of trial, immediately prior to the selection of the jury, the prosecution moved to exclude witnesses from the trial, which the defendants joined. Lim was serving as an interpreter during the proceedings and he mentioned that he had received a subpoena from the government. Lim raised the concern that if he was to be called as a witness he would, perhaps, have to be excluded from the courtroom. The government explained that it only intended to call Lim if it needed to impeach Hieng with a prior inconsistent statement, and then only for the purpose of establishing the accuracy of the translation of Hieng's statements. The government clarified that it intended to call the officer who took Hieng's statement to testify regarding the statement itself and did not have a problem with Lim remaining in the courtroom during the trial.

The district court responded that the "only potential . . . for dispute is if Mr. Lim or Mr. Hieng disagreed with the interpretation. Then you would have the right to call the interpreter to ask him about the meaning in the Cambodian language versus the English language of what was said." The court con-

cluded that, "the interpreter is obviously not a percipient or a fact witness to any of the events. This rather goes to his job as an interpreter and the accuracy of his translation of an interview."

Hieng's attorney neither objected to Lim's presence at trial, nor raised the possibility that Hieng would want to confront Lim. Hieng's attorney said,

> My only point of contention is that I'm not so sure the only issue is the accuracy of the Cambodian language in this issue. What I'm trying to get at is it's possible, just as in speaking the English language, that somebody doesn't write it down verbatim and they shorthand it. . . . I'm saying that regardless of what was translated into English, it's possible the officer may have written something else down in shorthand or whatever . . . .

The district court responded that Hieng would be entitled to question the accuracy of the officer's transcription of the translated statement, and that accuracy of transcription is always an issue whenever a statement is taken.

## III.

### A.

Hieng's first argument is that the district court committed plain error by admitting Special Agent Kunkel's testimony regarding the statements Hieng made during the post-arrest interview on July 2, 2008 because the statements were inadmissible under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 as statements made during plea discussions. The government responds that the statements were admissible because the circumstances of the interview indicate that it was a proffer meeting, that is, a private meeting with the government where Hieng will answer questions

perhaps leading to a plea agreement. In such a meeting, Hieng would have agreed that his statements could be used to impeach him if he testified differently.

Hieng did not object to Kunkel's testimony at trial. Hieng argues now that the district court committed plain error by failing to inquire, *sua sponte*, whether he had waived his rights under Rule 11(f) and Rule 410. We now consider whether the district court had such a duty.

**[1]** By arguing that Hieng made his statements during a proffer meeting, the government concedes that the interview likely constituted a plea discussion. However, a defendant may waive his right not to have statements made during plea discussions used against him. *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995). The government never presented the district court with a waiver agreement. It argues, however, that Hieng's failure to object to Kunkel's testimony creates a reasonable presumption that such an agreement exists.

The district court did not need to inquire, *sua sponte*, whether Hieng had waived his right not to have the statements he made during proffer discussions used against him. It may be that a district court commits plain error if it allows the government to introduce evidence that is obviously inadmissible. But it is not always obvious whether statements made during a proffer discussion are inadmissible. After *Mezzanatto*, we expect that prosecutors will routinely require, as a condition for holding a proffer meeting, that suspects agree that their statements may be used for impeachment. Where the government has held a proffer meeting with a defendant and the defendant testifies in his own defense at trial, a district court would not be surprised if a defendant does not object to the government's use of prior inconsistent statements made during the proffer meeting.

**[2]** Of course, a defendant's failure to object at trial to the admission of statements made during a proffer meeting does

not necessarily mean that a valid waiver agreement exists. But from the district court's perspective, a defendant's failure to object to such evidence may be reasonably interpreted as indicating that the defendant previously waived his rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.

Hieng argues that this holding is contrary to the maxim that "[c]ourts should 'indulge every reasonable presumption against waiver,' and they should 'not presume acquiescence in the loss of fundamental rights.'" *Barker v. Wingo*, 407 U.S. 514, 525-26 (1972) (citations omitted). But even if we assume that the statutory right to speak freely in proffer discussions without fear that statements will be used at trial is fundamental, our holding does not release the government from its burden of proof if the existence of a waiver is actually contested.

**[3]** We do not disagree with the proposition that if the defendant informs the district court that he did not waive his rights, the district court should be exacting in requiring the government to show that he did. But the responsibility to put that fact in issue rests with the defendant, not the court. Here, where the prosecution used Hieng's statements for a purpose that would not be unexpected, given the prevalence of *Mezzanatto* waivers, the district court may have reasonably presumed that Hieng's failure to object meant that he agreed that his statements were admissible. The district court committed no plain error in failing to inquire, *sua sponte*, whether Hieng had waived his rights.

**B.**

Hieng also argues that the admission into evidence of Special Agent Kunkel's testimony violated his Sixth Amendment right to be confronted with the witnesses against him. He contends that the district court stripped him of the right to confront interpreter Lim, when it concluded, prior to the selection

of the jury, that Lim was not a percipient or fact witness and, therefore, did not need to testify. At trial, Hieng never asserted a right to confront Lim and we, therefore, review for plain error.

**[4]** In *United States v. Nazemian* we held that, under appropriate circumstances, a person may testify regarding statements made by the defendant through an interpreter without raising either hearsay or Confrontation Clause issues because the statements are properly viewed as the defendant's own, and the defendant cannot claim that he was denied the opportunity to confront himself. 948 F.2d 522, 525-26 (9th Cir. 1991). A defendant and an interpreter are treated as identical for testimonial purposes if the interpreter acted as a "mere language conduit" or agent of the defendant. *Id.* at 528. The district court must determine "whether the translated statements fairly should be considered the statements of the speaker" (i.e., whether the interpreter can be deemed a language conduit) on a case-by-case basis. *Id.* at 527. In making the determination, the district court must consider all relevant factors, "such as which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated." *Id.* Where the defendant does not object at trial, the reviewing court will hold there is plain error only if the evidence in the record indicates that the district court plainly should not have treated the interpreter as a language conduit. *Id.*

**[5]** Hieng has not identified anything in the record suggesting that Lim was anything other than a language conduit. The record indicates Lim was a highly competent interpreter. He interpreted not only at the interview in dispute, but also during trial and in private meetings between Hieng and his attorney. There is no indication that Lim had any motive to mistranslate. The district court properly treated Lim as a mere language conduit for Hieng. Under *Nazemian*, Hieng did not

have any constitutional right to confront Lim because the interpreted statements are directly attributable to Hieng.

Hieng argues that *Nazemian* has been overruled by *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny. As a three-judge panel, we are bound by circuit precedent unless the United States Supreme Court or an en banc court of our circuit has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). We now determine whether *Crawford* and its progeny directly overruled *Nazemian* or whether the cases are clearly irreconcilable.

In *Crawford*, the Supreme Court held that "testimonial" hearsay statements are not admissible unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. 541 U.S. at 68. *Crawford* overruled *Ohio v. Roberts*, 448 U.S. 56 (1980), which had held that hearsay statements are admissible if the court determined that they were sufficiently reliable. *See Crawford*, 541 U.S. at 61-62.

The Supreme Court further developed the principle proclaimed in *Crawford* in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), and *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011). In *Melendez-Diaz*, the Court held that "certificates of analysis" which reported the weight of a substance and that the substance contained cocaine constituted testimonial statements. 129 S. Ct. at 2532. Accordingly, the analysts who signed them were witnesses for purposes of the Sixth Amendment. *Id*. Similarly, in *Bullcoming* the Court held that the Confrontation Clause was not satisfied when the prosecution introduced a forensic laboratory report containing a testimonial certification "through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." 131 S. Ct. at 2710.

**[6]** These cases make it clear that, if a testimonial statement is introduced, the Sixth Amendment requires opportunity for confrontation of the person who made the statement. They do not address the question whether, when a speaker makes a statement through an interpreter, the Sixth Amendment requires the court to attribute the statement to the interpreter. None of these cases, therefore, are in direct conflict with our holding in *Nazemian*.

The cases are also not clearly irreconcilable because we can apply *Nazemian* without running afoul of *Crawford*. We held in *Nazemian* that whether the interpreter must be considered a declarant, rather than a language conduit, is a threshold inquiry, and that confrontation concerns do not even arise if the statement may be fairly attributed directly to the speaker. 948 F.2d at 525-26. If a court were to hold that the statement must be attributed to the interpreter, it would, under *Crawford*, ask whether the statement, as applied to the interpreter, was testimonial. If so, the statement could not be admitted without opportunity for confrontation of the interpreter. But if the court determines that a statement may be fairly attributed directly to the original speaker, then the court would engage in the *Crawford* analysis only with respect to that original speaker. Where, as here, that speaker is the defendant, the Sixth Amendment simply has no application because a defendant cannot complain that he was denied the opportunity to confront himself.

We recognize that there is some tension between the *Nazemian* analysis and the Supreme Court's recent approach to the Confrontation Clause. Our threshold inquiry in *Nazemian* which asks whether a translated statement may be attributed directly to the original speaker and not be attributed to the interpreter who literally uttered it, stems from principles of the law of evidence. Abandoning *Ohio v. Roberts*, *Crawford* might be read as essentially divorcing Sixth Amendment analysis from the law of evidence. *See Crawford*, 541 U.S. at 51 ("Leaving the regulation of out-of-court statements to the

law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices").

On the other hand, *Crawford* and cases that follow it continue to use the vocabulary of the law of evidence in their Sixth Amendment analyses. For example, the Court often uses the term "hearsay" when referring to the type of out-of-court statements that may require confrontation. *See, e.g., Crawford*, 541 U.S. at 53 ("In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object . . . ."); *id.* at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ."); *Davis v. Washington*, 547 U.S. 813, 823 (2006) ("We must decide . . . whether the Confrontation Clause applies only to testimonial hearsay; and, if so, whether the recording of a 911 call qualifies"). Further, even testimonial statements may be admitted without confrontation if they are offered "for purposes other than establishing the truth of the matter asserted" and, therefore, constitute nonhearsay. *Crawford*, 541 U.S. at 59 n.9, *citing Tennessee v. Street*, 471 U.S. 409, 414 (1985).

**[7]** We conclude that the Court's recent Confrontation Clause cases provide no clear guide with respect to the interplay, if any, between the Confrontation Clause and the law of evidence. Even if there is some tension, our approach to interpreted statements is not clearly inconsistent with the *Crawford* line of cases. Without a further pronouncement from the Court, we conclude that *Nazemian* remains binding in this circuit.

## C.

Hieng also contends that the district court erred by allowing Detective Jensen's testimony, which was based on hearsay reports, to prove the total number of marijuana plants eradi-

cated by the Fresno County Sheriff's detectives. Hieng did not object to this testimony on hearsay grounds at trial. His co-defendant, Lem Phin, however, raised that objection on at least four occasions. Even though Hieng did not join Phin's objection, we review for abuse of discretion rather than plain error because the matter was sufficiently brought to the attention of the district court. *See United States v. Hardy*, 289 F.3d 608, 612 n.1 (9th Cir. 2002) ("Although Hardy's counsel did not object to the agent's testimony, the objection by his co-defendant's counsel preserved the issue for both defendants"), *citing United States v. Brown*, 562 F.2d 1144, 1147 n.1 (9th Cir. 1977).

We conclude that the district court failed to apply the proper hearsay analysis. However, we need not reverse if the record indicates that Detective Jensen's testimony was admissible under established hearsay exceptions. "We may affirm the district court's evidentiary ruling on any grounds supported by the record." *United States v. Ibarra-Pino*, 657 F.3d 1000, 1005 (9th Cir. 2011).

Detective Jensen did not base his testimony as to the total plant count on his own personal knowledge. According to Jensen, he and other detectives eradicated marijuana plants growing in the vineyard row by row. Jensen testified that each detective kept track of the number of plants he personally eradicated as they went down each row and then reported their tallies to him at the end of each row. Other detectives who participated in the eradication corroborated Jensen's testimony. Jensen recorded each detective's tally by writing it down on a notepad or a piece of paper. The next day, Jensen manually added the tallies, verified the accuracy of his addition, and entered the total number of plants in his report.

**[8]** Hieng correctly argues that Jensen's testimony with respect to the total number of plants was based on hearsay. The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the

current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The total tally offered by Jensen at trial was a sum based on a number of statements made out of court by a number of declarants. The government offered this total to prove the truth of the matter asserted in the declarants' out-of-court statements. Because Jensen's testimony was founded almost entirely on hearsay, it should not have been admitted unless all of the hearsay statements underlying the testimony fit within an exception to the rule against hearsay. Fed. R. Evid. 802, 805.

On three separate occasions at trial, the district court sustained Phin's objections to Jensen's testimony on the ground that it was based on hearsay and therefore, could not be offered for its truth. However, after Jensen fully explained his method for counting the plants, the district court overruled Phin's hearsay objection and admitted the testimony, "finding that the reliability of the method was such that by each officer's count being communicated and then written down, that that goes to the weight, not the admissibility."

The district court's definitive ruling on Phin's hearsay objection does not invoke any of the established exceptions to the rule against hearsay. The Federal Rules of Evidence do not include a "reliability" exception. While reliability is the touchstone of all the hearsay exceptions, the exceptions themselves—not the trial judge's intuitive conclusions—are the criteria for whether hearsay evidence is sufficiently reliable to overcome the rule against hearsay.

The government argues on appeal that Detective Jensen's testimony fits within Rule 807, the residual exception to the rule against hearsay. Detective Jensen's testimony might very well satisfy the general requirements of Rule 807.[1] However,

---

[1]Rule 807 generally provides for the admission of hearsay statements under the following conditions:

the government completely ignores Rule 807's notice require-ment. Under the rule, a hearsay statement is admissible "only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b). Without any showing that the government provided this required notice or that the notice should be excused, *see United States v. Bachsian*, 4 F.3d 796, 799 (9th Cir. 1993), we will not accept the government's argument that the district court properly admitted the testimony under Rule 807. There-fore, we must review whether the hearsay statements which Jensen relied on fall within established hearsay exceptions.

Jensen's testimony involved three levels of hearsay, each of which must conform to an exception in order for the testi-mony to be admissible. Fed. R. Evid. 805. At the most basic level, Jensen's testimony incorporated the out-of-court reports he received from other Fresno County Sheriff's Department detectives. These reports are admissible under the present sense impression exception for statements "describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1).

Here, the eradication of the marijuana plants constitutes an event that was perceived by the detectives who participated in

---

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reason-able efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a).

it. These detectives described the event while it was taking place by reporting the number of plants they had just counted to Detective Jensen at the end of each row. Their reports to Detective Jensen were present sense impressions.[2]

---

[2]Judge Berzon disagrees with our application of the present sense impression exception to the reports of the detectives who counted the marijuana plants. *See* Concurrence, Part I. Her fear that this ruling expands the exception beyond its limits is not justified.

Contrary to Judge Berzon's characterization, the detectives' reports were not "calculations *derived from* their observations." Concurrence 5089. The detectives did not arrive at the reported numbers through a mathematical process. They simply counted each plant that they observed. Counting is an ordinary and fundamental aspect of observation. It is a way to keep track of the details. Counting is not the sort of complex thought process that interposes "an intermediate step between the receipt of the present sense impression and the utterance." *See* Edward J. Imwinkelreid, *The Need to Resurrect the Present Sense Impression Hearsay Exception: A Relapse in Hearsay Policy*, 52 How. L.J. 319, 345 (2009).

Judge Berzon views the detectives' reports as a "cumulation of sense impressions over a period of time, mediated through a thought process that could easily contain errors." Concurrence 5088. Essentially, Judge Berzon considers each plant sighting to be a separate "event." We need not interpret that term so narrowly. Certainly, the term "event" as used in Rule 803(1) must be constrained by reasonable time limits. But that does not mean an event must be instantaneous.

Here, the detectives reported the number of plants they saw at the end of each row. We do not disagree with Judge Berzon that the eradication of each row probably took "some minutes." But the detectives' reports are sufficiently close in time to the actual observation that there is not a significant risk that memory loss caused faulty reports. The time each detective may have waited between viewing the plants and reporting their counts did not give them a substantial opportunity to reflect or deliberate as to whether they would provide an accurate count or an inflated one.

Judge Berzon expresses a concern that the detectives might not have had to testify before the jury if the present sense impression exception applies. But if hearsay statements are testimonial, then the Confrontation Clause will ensure that the declarant is subject to cross-examination. If the Confrontation Clause does not apply and evidence is sufficient to bring a statement within an exception to the hearsay rule, there is no reason to insist on in-court testimony.

The second level of hearsay in Detective Jensen's tally sheet is the note pad or paper upon which Jensen recorded his own tallies and the tallies reported by his fellow detectives. The government did not attempt to introduce Jensen's tally sheet into evidence, but Jensen testified that the total he entered in his report was the sum of the tallies he recorded on the tally sheet. This tally sheet falls comfortably within the exception for recorded recollections. Fed. R. Evid. 803(5). A recorded recollection is "[a] record that: (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge." *Id.*

Detective Jensen did not recall the number of plants he personally eradicated. However, he counted those plants as he was eradicating them and, while the matter was fresh in his memory, accurately recorded that count on his tally sheet. The tally sheet, therefore, contains Jensen's recorded recollection of his own plant counts. With respect to the other detectives' counts, Detective Jensen testified that he accurately recorded the numbers each detective reported to him immediately after they gave him their verbal reports, while the matter was fresh in his mind. Therefore, the tally sheet also contains a record of Detective Jensen's recollection of the other detectives' utterances of their present sense impressions. The tally sheet would, therefore, be admissible notwithstanding its hearsay character.

Finally, we have Detective Jensen's formal report. Detective Jensen based his testimony on this hearsay document. We must determine, at least with respect to the total plant count, whether Jensen's report constitutes a recorded recollection.

Detective Jensen testified that, on the day after the eradication, he manually calculated the sum of the plant counts recorded on the tally sheet and entered the total in his report. The total of the tallies recorded on the tally sheet is a matter

that Detective Jensen once knew because, at one point in time, he had the tally sheet in front of him and personally performed the addition. However, he could not recall that total accurately at the time of the trial because he did not have the tally sheet before him. Jensen recorded his recollection of the total in his report immediately after calculating it from the tally sheet, while it was fresh in his mind. He testified that the total he recorded in his report accurately reflected his knowledge regarding the total in the tally sheet. Therefore, Detective Jensen's statement in his report as to the total number of marijuana plants qualifies as a recorded recollection with respect to the total number of plants recorded on the tally sheet. *See* Fed. R. Evid. 803(5).

**[9]** In sum, while the district court did not rigorously apply the rules of evidence to each level of hearsay underlying Jensen's testimony, it ultimately reached the correct result. Detective Jensen's testimony regarding the total plant count was based on a recorded recollection of the numbers listed on his tally sheet. The tally sheet, in turn was a recorded recollection of Jensen's own activities and the verbal reports of his fellow detectives. Finally, the reports of the other detectives were present sense impressions. The testimony was admissible because each level of hearsay upon which it was based fell within an established exception to the hearsay rule. *See* Fed. R. Evid. 802, 805. Therefore, there was no reversible error.

### D.

Hieng's conviction triggered a statutory minimum sentence of imprisonment for ten years. 21 U.S.C. § 841(b)(1)(A)(vii). He contends that the district court should have relieved him from the statutory minimum under the safety valve of 18 U.S.C. § 3553(f). The district court refused to apply the safety valve because it did not find that Hieng had "truthfully provided to the Government all information and evidence [he had] concerning the offense." 18 U.S.C. § 3553(f)(5). We review the district court's factual finding for clear error.

**[10]** The district court's finding that Hieng failed to prove that he truthfully provided to the government all the information and evidence he had is not clearly erroneous. Based on his testimony at trial, it appears the only information Hieng provided to the government regarding the offense was that somebody named Prasit hired him to sign a contract and to stay at the house at night. He denied that he had any knowledge of the marijuana growing operation. However, Hieng's conviction indicates that the jury did not believe his testimony that he had no knowledge of the marijuana growing operation. If Hieng actually did know about the marijuana growing operation, it would be logical to infer that he had more information or evidence about the operation than he had previously provided. Given the conflicting evidence, the district court could well have found that Hieng had withheld information or evidence that he had concerning the marijuana growing operation.

**[11]** Hieng argues that the district court committed clear error because, in delivering its sentence, it misstated some of the evidence that had been presented. For example, in pronouncing the sentence from the bench, the district court mistakenly said that Hieng had been recruited by Vanthy Chan, someone he knew, and that Hieng said he had never gone into the backyard. However, these were not the facts upon which the district court based its finding that Hieng was not entitled to safety valve relief. Rather, the district court found that "it is not believable that Mr. Hieng would not have smelled, seen and known of the presence of the marijuana." Sentencing Tr. at 28:2-3 (Sept. 21, 2009). The court rejected Hieng's claim to safety valve relief because "[t]he Court, like the jury, does believe that there was very substantial evidence to show Mr. Hieng's knowledge under the totality of the circumstances. He was staying at a marijuana grow site. And an indoor marijuana grow as well." *Id.* at 28:24-29:3. The evidence that the district court actually relied on to find that Hieng must have known about the marijuana growing operation supports that finding. Its inference from that finding that Hieng had more

information or evidence than he had previously shared with the government was permissible. Therefore, there was no clear error in the district court's factual findings.

## E.

Finally, Hieng contends that even if errors committed by the district court were harmless when considered individually, their cumulative effect resulted in an unfair trial. As explained above, Hieng has not shown that the district court committed multiple errors, harmless or not. Furthermore, the record is not sufficiently developed to allow us to rule on Hieng's half-hearted argument that his trial counsel failed to provide effective assistance. To the extent cumulative error is a valid doctrine, it is simply inapplicable here.

**AFFIRMED.**

---

BERZON, Circuit Judge, concurring:

I concur in the majority opinion with one exception: I cannot agree with the assertion on pages 5080-81 that the report by the detectives who "eradicated" the marijuana plants as to the number of plants they counted qualifies as a present sense impression under Rule 803(1) of the Federal Rules of Evidence. As I explain in Parts I and II of this concurrence, applying the present sense exception to the facts of this case profoundly distorts the exception and applies it far beyond the realm supported by its underlying rationale.

Indeed, neither the parties nor the district court ever suggested that this exception applied here—the majority has inserted it into this case on its own initiative. The government argued that the admission of the officers' count of the marijuana plants should be affirmed based on Federal Rule of Evidence 807, the residual exception to the hearsay rules. I agree.

The officers' count easily falls within the scope of Rule 807, and applying that Rule implicates none of the problems created by applying the present sense impression exception.

In addition, as I explain in Part III, although I agree with the opinion's conclusion that *United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991), is not so "clearly irreconcilable," *Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir. 2003) (en banc), with *Crawford v. Washington*, 541 U.S. 36 (2004), as to permit a three-judge panel to overrule *Nazemian*, I believe the continued vitality of *Nazemian* after *Crawford* is an issue that merits en banc review in an appropriate case.

## I.

The opinion relies on the present sense impression exception, Fed. R. Evid. 803(1), to support the admissibility of Fresno County Sheriff's Department deputies' statements regarding the number of marijuana plants in the defendant's field. As they destroyed the marijuana row-by-row, the deputies tallied the number of plants they had picked and gave those numbers to Detective Jensen, who recorded their statements. According to the opinion, the deputies' calculations were descriptions of the destruction of the marijuana field and therefore admissible as present sense impressions. That application, however, extends Rule 803(1) well beyond its limits.

The government did not argue before the district court nor before us that the present sense impression applies. The district court did not rule on the basis of this exception. We therefore have had no briefing on the issue. That it occurred to no one previously associated with this case that the present sense impression exception might apply is reason enough to make its application suspect. Moreover, while imaginative, the majority's analysis bends that exception out of shape in a manner that, in other cases, could seriously undermine the hearsay rules.

I begin by noting that what while the majority's view of what constitutes a present sense impression leads, on the facts of this case, to a relatively narrow admission of evidence, its application to other cases could lead to a much broader exception. Here, because the deputies' counts of the marijuana plants were testimonial, they were required under the Confrontation Clause to testify, thereby allowing the jury to assess the officers' credibility. *See Crawford*, 541 U.S. at 68-69. However, if the calculations were nontestimonial—for example, if the officers were reporting their counts in order to coordinate counting efforts rather than to record evidence, *see United States v. Solorio*, 669 F.3d 943 (9th Cir. 2012)—there would be no requirement that they testify, so evidence of their calculations could be admitted without any opportunity for the jury to assess their credibility. Under Rule 807, in contrast, only evidence that "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts" is admissible. Fed. R. Evid. 807(a)(3). Therefore, if the residual exception were to apply, the officers would ordinarily still be required to testify, whether or not they were so required under the Confrontation Clause, for such testimony would be the most probative evidence of their actions. That is, hearsay evidence would be admissible under Rule 807 only to the extent that it was not available via direct testimony. Thus, Rule 807 permits a much narrower exception to the hearsay rules than does the majority's expansion of Rule 803.

This analysis highlights the problem with the notion that Jensen was recording a present sense impression: In fact, he was not recording the officers' sense impressions *when* they were collecting the marijuana plants. Instead, what Jensen testified to was the *result* of a mental process—counting a series of marijuana plants while they were collected, and, ultimately, determining how many there were in total. Because of the large number of marijuana plants, the detectives could not determine the total number of plants just by looking at them, but had to interpose over some period of time—some minutes

at least—a mental method for determining the number of plants. This sort of cumulation of sense impressions over a period of time, mediated through a thought process that could easily contain errors, is neither "present" nor a "sense impression," and is therefore not encompassed by Rule 803(1).

Rule 803(1) provides a narrow exception to the hearsay rule for statements "describing or explaining an event or condition, made while or immediately after the declarant perceived it." The exception is grounded in the premise that "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation," but "[s]pontaneity is the key factor." Fed. R. Evid. 803(1) advisory committee's note. To qualify as a present sense impression, a statement must occur simultaneously with the event, although "a slight lapse is allowable" if "precise contemporaneity is not possible." *Id.*

The reason present sense impressions are considered inherently reliable is because statements contemporaneously describing an event are unlikely to reflect memory loss or provide an opportunity to lie. *See* Douglas D. McFarland, *Present Sense Impressions Cannot Live in the Past*, 28 Fla. St. U. L. Rev. 907, 914 (2001). The fundamental pivot of the exception is the "nature of the thought process producing the statement rather than the substantive content of the statement." Edward J. Imwinkelreid, *The Need to Resurrect the Present Sense Impression Hearsay Exception: A Relapse in Hearsay Policy*, 52 How. L.J. 319, 345 (2009). Closeness in time between the statement and the event is therefore critical in eliminating the unreliability that is introduced when declarants have the opportunity to reflect on and interpret the event. *See id.* Contemporaneous expression limits declarants' ability to lie or misremember; "[w]hen the thought process is complex, involving an intermediate step between the receipt of the present sense impression and the utterance," the statement no longer qualifies. *Id.*

It is true, of course, that mental processes interpret what the eyes see or the ears hear, so that not *all* opportunity for error through those processes is eliminated through contemporaneity. Some people are colorblind and others can only hear limited tone ranges, so they will misreport what they contemporaneously perceive. But the present sense exception seeks to minimize the opportunities for mistake or prevarication that occur when mental processes beyond those necessary to connect a sense impression to a verbal description. The exception's "language, rationale, and history do strongly suggest that . . . there should be no delay beyond an acceptable hiatus between perception and the cerebellum's construction of an *uncalculated* verbal description." Jon R. Waltz, *The Present Sense Impression Exception to the Rule Against Hearsay: Origins and Attributes*, 66 Iowa L. Rev. 869, 880 (1981) (emphasis added).

Here, the deputies' statements as to the number of plants they had collected were calculations *derived from* their observations, but were not reports of the observations themselves. Such purposeful analysis of sense impressions after the fact is not covered by the present sense impression exception. Because they did not simply report each plant as they saw it but rather, at the end of their collecting and counting process, reported to Jensen the results of their calculation, the officers both had time to reflect and therefore not to tell the truth, and, more importantly, the opportunity to make mistakes in the calculation.

Our Circuit's caselaw, as well as that of other circuits, supports a narrow interpretation of the present sense impression exception consistent with this analysis:

- "[T]o qualify under either [FRE 803(1) or 803(2)], an out-of-court statement must be nearly contemporaneous with the incident described and made with little chance for reflection." *Bemis v. Edwards*, 45 F.3d 1369, 1373 (9th Cir. 1995).

- "The theory behind [the present sense impression, excited utterance, and state of mind] exceptions is that the greater the circumstances for misrepresentation, the less reliable is the declaration. . . . [T]he fact that [the defendant] went through several drafts indicates that he had ample time to reflect upon his statements. Thus, any evidence provided by the letter was unreliable." *United States v. Faust*, 850 F.2d 575, 586 (9th Cir. 1988) (internal citations and quotations omitted).

- "In making the foundational inquiry on admissibility under [FRE 803(1) (present sense impression), 803(2) (excited utterances), or 803(3) (state of mind)], the court must evaluate three factors: contemporaneousness, chance for reflection, and relevance." *United States v. Ponticelli*, 622 F.2d 985, 991 (9th Cir. 1980), *overruled on other grounds by United States v. De Bright*, 730 F.2d 1255 (9th Cir. 1984).

- "The declarant makes a statement describing the event at or very near the time of the observation . . . We admit the statement because the circumstances under which it was given—immediately after an observation—diminish substantially the opportunity for fabrication." *United States v. McElroy*, 587 F.3d 73, 86 (1st Cir. 2009).

- "[T]he temporality requirement must be rigorous because the passage of time—or the lack thereof—is the effective proxy for the reliability of the substance of the declaration." *United States v. Green*, 556 F.3d 151, 155-56 (3d Cir. 2009). There, the declarant's statement was problematic not only because of a 50 minute lapse in time, but also because he was responding to requests by the DEA to explain the event. *Id.*

- "A declarant who deliberates about what to say or provides statements for a particular reason creates the possibility that the statements are not contemporaneous, and,

more likely, are calculated interpretations of events rather than near simultaneous perceptions." *United States v. Woods*, 301 F.3d 556, 562 (7th Cir. 2002).

Again, although the extension of the present sense impression exception to the circumstances of this case may seem relatively harmless, I do think that is because the detectives *did* testify to their actual sense impressions, and only could not testify as to the number they reported. We have to consider this case, however, as if they did not testify, because if the present sense impression exception does apply, they might not have had to testify at all. I do not see how that scenario could possibly comport with the basic underpinnings of the hearsay rule, or with the limited scope of Rule 803(1).

## II.

I am not suggesting that we should reverse. Instead, I would rely on what the government does argue—that the catchall hearsay exception applies. The opinion indicates that Rule 807 is substantively appropriate, but that the lack of pretrial notice is fatal. I don't see why that is so.

First, Hieng has not objected that he received insufficient notice. As far as I can determine, the current record does not indicate whether there was sufficient notice. For all we know, there may have been.

More substantively, even if there was not proper pretrial notice, there was, in fact, a good deal of notice during the trial —before the testimony was introduced—as to how the government wanted to proceed. As the opinion explains, the government tried to introduce Jensen's calculations several times, but the district court sustained hearsay objections. Eventually, however, the methodology was fully explained, and the district court admitted the evidence. There is no indication whatsoever that notice of an intent to invoke Rule 807 would have made any difference, and the evidence was in no way sprung

on the defense. "[F]ailure to give pretrial notice will be excused if the adverse party had an opportunity to attack the trustworthiness of the evidence." *United States v. Bachsian*, 4 F.3d 796, 799 (9th Cir. 1993).

Moreover, examined from the perspective of Rule 807, and given that the detectives did testify (and that, as the opinion explains, once the totals reported to Jensen are in evidence, other hearsay exceptions cover the tally sheet and report). the only "hole" that has to be covered by Rule 807 is quite narrow. The district court was careful to ensure that the officers' information was trustworthy, that other evidence toward the same end was not available, and that admission of the evidence served the purposes of the evidence rules. *See* Fed. R. Evid. 807(a). The court insisted that each officer testify first as to his methodology in extracting, counting, and reporting the number of marijuana plants. Proceeding in this way ensured that the jury had the chance to assess the credibility of each of the officers who collected the plants. Further, Rule 807 is context-specific, and so, unlike the majority's expansion of the present sense impression exception, does not threaten in future cases to leave the hearsay rule in the dust.

In sum, my concern is that we not bend seriously out of shape a hearsay exception grounded in precepts not here applicable. Although the role of the present sense impression exception here is narrow, if applicable, it could allow a trial to proceed without the testimony of the detectives who actually saw and collected the marijuana plants, opening up a huge hole in the hearsay rule. I would hold instead that, on this record, the catchall hearsay exception applies and that either the notice requirement was waived because not raised by Hieng or any lack of notice was harmless.

### III.

In my view, the holding in *Nazemian* rests, at bottom, on a pre-*Crawford* understanding of the unity between hearsay

concepts and Confrontation Clause analysis. Moreover, its ultimate conclusion—that a translator's out-of-court version of a testimonial statement need not be subject to cross-examination at trial—seems in great tension with the holdings of *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011), that laboratory reports may not be admitted without testimony by the individuals who conducted the laboratory tests. Translation from one language to another is much *less* of a science than conducting laboratory tests, and so much more subject to error and dispute. Without the ability to confront the person who conducted the translation, a party cannot test the accuracy of the translation in the manner in which the Confrontation Clause contemplates. I therefore believe that this issue should be considered en banc at some juncture.

Here, however, the issue was not raised at trial, so our review is for plain error, and the translator was in fact in the court room and could have been called, introducing an additional consideration—whether it matters that the government did not call a translator who was readily available to the defense. Quite possibly it does, but plain error review under these circumstances would contort and complicate our consideration of a novel constitutional issue. I would therefore await a case in which the question was properly raised at trial and would then hear that case en banc.