**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

CLAUDIO ROMO-CHAVEZ,
        *Defendant-Appellant.*

No. 10-10424

D.C. No.
4:09-cr-01045-
FRZ-JCG-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Frank R. Zapata, Senior District Judge, Presiding

Argued and Submitted
December 6, 2011—San Francisco, California

Filed May 23, 2012

Before: Diarmuid F. O'Scannlain and Marsha S. Berzon,
Circuit Judges, and Robert S. Lasnik, District Judge.*

Opinion by Judge O'Scannlain;
Concurrence by Judge Berzon

---

*The Honorable Robert S. Lasnik, United States District Judge for the
Western District of Washington, sitting by designation.

---

**COUNSEL**

M. Edith Cunningham, Assistant Federal Public Defender, Tucson, Arizona, argued the cause and filed the briefs for the appellant. With her on the briefs was Jon M. Sands, Federal Public Defender for the District of Arizona.

Bruce M. Ferg, Assistant United States Attorney, Tucson, Arizona, argued the cause and filed the brief for the appellee. With him on the brief were Dennis K. Burke, United States Attorney and Christina M. Cabanillas, Appellate Chief, for the District of Arizona.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the Confrontation Clause or the Federal Rules of Evidence prohibit the government from introducing at trial a defendant's admissions to a police officer because the translator who facilitated them, while conversationally fluent, would not qualify as a court interpreter.

I

Claudio Romo-Chavez is a citizen and national of Mexico. In May 2009, he attempted to enter this country at the DeConcini Port of Entry in Nogales, Arizona, driving a 1999 Buick Century. During primary inspection, he was greeted by Customs and Border Protection ("CBP") Officer Brian Tipling. Romo-Chavez told Officer Tipling that he was from Magda-

lena, Mexico, and that he was entering the United States to return two shirts to the Dillard's store in Scottsdale. Finding the story suspicious, Officer Tipling employed a long-handled mirror to examine the underside of Romo-Chavez's vehicle and found evidence of tampering on the bolt holding the fuel tank to the undercarriage.

Romo-Chavez was referred to secondary screening, where he told CBP Officer David Aldrich that he was from somewhere between Obregon and Hermosillo, Mexico (several hours by car south of Magdalena). He also stated that he was going to " 'Tucson, maybe Phoenix,' " and that "part of it was for business and part of it was for pleasure."[1] Aldrich, alerted by Tipling and similarly suspicious of Romo-Chavez's story, examined the Buick. He noticed a tampering in the backseat area above the gas tank as well as a smell he associated with secret compartments.

## A

CBP Officer Jeff Steger arrived with his drug detection dog, who alerted to something in the vehicle. He informed his supervisor, who called away Officer Aldrich. At this time, Officer Steger collected some personal items from the Buick, which he deemed to be of no evidentiary value and placed them into a bag for storage. Romo-Chavez was promptly notified how he could collect these items.[2] Another CBP Officer, Edward Vejar, pried open a carefully constructed box located in the Buick's gas tank and found a number of packages con-

---

[1]Because Officers Aldrich and Tipling speak Spanish, they did not require the assistance of a translator. Though there was some discussion of their qualifications at trial, Romo-Chavez does not challenge that matter in this appeal.

[2]Though Romo-Chavez's attorney collected the currency that he had possessed at the time of his arrest, the majority of the items remained in CBP storage for months. They were eventually destroyed in accordance with routine CBP protocol.

taining white crystalline material, which tested presumptively positive for methamphetamine.

B

While Officers Steger and Vejar were collecting these items, Romo-Chavez was questioned by Special Agent Andrew Simboli of Immigration and Customs Enforcement ("ICE"). Romo-Chavez told Simboli that he was from Nogales, Mexico (which is north of both Magdalena and Obregon) and provided some basic biographical information. Having exhausted his knowledge of Spanish, Agent Simboli required a translator to facilitate further conversation.

With the assistance of CBP Officer David Hernandez, Agent Simboli Mirandized Romo-Chavez in Spanish. Officer Hernandez then translated as Romo-Chavez explained that he came to the United States to return two shirts to a Dillard's in Phoenix. When Agent Simboli asked why he was not going to the Dillard's in Tucson, Romo-Chavez changed his answer to say that he was indeed going to that store. Romo-Chavez also told the agent that the previous Saturday he had received an offer to sell the Buick in exchange for a small truck and $2,000 and that he was going to meet the buyer at an Auto-Zone in Nogales to complete the transaction. After Romo-Chavez told Simboli that he had recently had an engine sensor replaced in his car, Simboli asked him about the methamphetamine that had by this time been discovered in his car. Romo-Chavez denied knowledge, and the interview ended.

Agent Simboli testified that he recognized proper nouns such as "Phoenix" and "Dillard's," but otherwise depended on Officer Hernandez's translation. Though Romo-Chavez later claimed not to have understood Officer Hernandez, the record does not indicate that he ever told Hernandez or Simboli at the time that he could not understand the questions.

## C

Further examination of the Buick revealed that several gallons of gasoline in its tank had been displaced with almost six kilograms of 99.6% pure methamphetamine. Investigation also showed that Romo-Chavez had a history of crossing the border with Gustavo Vargas-Dias, a known drug trafficker who had boasted to him that he trafficked in narcotics. Romo-Chavez was charged with knowing possession of methamphetamine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A)(viii) and with importing the substance into the United States in violation of 21 U.S.C. §§ 960(a)(1) and 960(b)(1)(H).

## D

At trial, Romo-Chavez's defense was that he was unaware that the drugs were in his car. He asserted that Vargas-Diaz, who helped him purchase his car and then helped to arrange repairs of the broken sensor, must have surreptitiously installed the secret compartment while the car was in the shop. Romo-Chavez testified that he was going to Phoenix primarily to inquire about enrolling in an online MBA program offered by the University of Phoenix. He said that returning the shirts was only a secondary goal and that he also wished to repair a crack in his windshield. He claimed that he would have been able to corroborate his story using certain personal items located in his car, particularly his cellular telephone, if only the government had preserved them. He attempted to explain away any apparent inconsistencies in his story as a result of Officer Hernandez's allegedly poor translation.

After a five-day trial, the jury convicted Romo-Chavez on all counts. Romo-Chavez timely appeals.

## II

On appeal, Romo-Chavez first argues that admission of Agent Simboli's account of what Romo-Chavez said during

the interview on the border violated both the rule against hearsay and the Confrontation Clause. The government counters that because Officer Hernandez served merely as a language conduit, his translations to Officer Simboli should be treated as Romo-Chavez's own statements.

A

**[1]** When an out-of-court statement is offered to prove the truth of the matter asserted, it is hearsay and generally inadmissible. Fed. R. Evid. 802. However, a party *may* introduce the out-of-court statements of his opponent as party admissions. Fed. R. Evid. 801(d)(2). Therefore, Romo-Chavez's statements were admissible if "the translated statements" made by Officer Hernandez "fairly should be considered the statements" of Romo-Chavez. *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991).

**[2]** Whether statements made through an interpreter should be considered statements of the original declarant "require[s] an analysis of the facts on a case-by-case basis." *United States v. Garcia*, 16 F.3d 341, 342 (9th Cir. 1994). Generally, we consider "the following four factors . . . : (1) which party supplied the interpreter, (2) whether the interpreter had any motive to mislead or distort, (3) the interpreter's qualifications and language skill, and (4) whether actions taken subsequent to the conversation were consistent with the statements as translated." *Id.* at 342-43 (citation and internal quotation marks omitted).

**[3]** The first factor weighs slightly in favor of Romo-Chavez. Officer Hernandez was supplied by—indeed was an employee of—the government. But "[t]he fact that [Hernandez] is a government employee does not, by itself, necessarily prevent" his translations from being admissible. *United States v. Sanchez-Godinez*, 444 F.3d 957, 960 (8th Cir. 2006)*; see also Nazemian*, 948 F.2d at 527-28; *United States v. Da Silva*, 725 F.2d 828, 832 (2d Cir. 1983). Though never dispo-

sitive, this factor would have greater weight if Officer Hernandez had "acted as both a translator and a federal law enforcement officer," by "ask[ing] the types of questions he 'normally would ask' in his capacity" as a government agent. *Sanchez-Godinez*, 444 F.3d at 960-61. But while Officer Hernandez did read Romo-Chavez his *Miranda* rights off a pre-printed card, the record indicates that he did not initiate any of the questions. *See id.*

**[4]** The second factor weighs in favor of the government. The district court found that Officer Hernandez had no motive to distort the translation, and Romo-Chavez presents no reason why this finding was clearly erroneous. We do not presume, as Romo-Chavez would have us do, that a public servant is inherently biased. *See United States v. Martinez-Gaytan*, 213 F.3d 890, 892 (5th Cir. 2000); *see also Germano v. Int'l Profit Ass'n*, 544 F.3d 798, 802-03 (7th Cir. 2008); *Da Silva*, 725 F.2d at 832;[3] *cf. United States v. Garcia-Martinez*, 228 F.3d 956, 961 (9th Cir. 2000).

**[5]** The third factor, the skill of the translator, also weighs in favor of the government. Whether an individual speaks a foreign language with sufficient fluency to act as a translator in a given situation is a question of fact. *Cf. Nazemian*, 948 F.2d at 527-28 (treating competence as an issue of fact and evidence). The evidence establishes that Officer Hernandez grew up in El Paso speaking Spanish, studied it in school, spoke it at home with his wife, and conducted interviews in it on a regular basis.

**[6]** We are unconvinced by Romo-Chavez's assertion that Hernandez was nonetheless incompetent to translate because

---

[3]We note that Romo-Chavez's only authority for his position is a footnote that we have already discounted. *Nazemian*, 948 F.2d at 527 (disregarding the language in *United States v. Felix-Jerez*, 667 F.2d 1297, 1300 n.1 (9th Cir. 1982), as dicta because it created an overly rigid frame of analysis).

he made minor mistakes when asked in court to recite the *Miranda* warnings from memory. Both Officer Hernandez and Agent Simboli testified that they had never attempted to Mirandize a suspect in any language without the use of a pre-printed form. We are even less persuaded that his difficulties translating the technical aspects of a real estate contract when asked to do so at trial indicate an inability to ask simple questions about an individual's purpose in coming to the United States. Judge Zapata, who "has a degree in Spanish . . . and [has] spoken Spanish [his] entire life," said that "he could not have translated" the contract. As such, the record fully supports Judge Zapata's conclusion that Officer Hernandez was competent to translate Romo-Chavez's answers about "where he was going, where he lived . . . those sorts of questions. It's not very high level Spanish."**4**

Because Romo-Chavez took no action after the translation, the fourth factor—whether those actions were consistent with the translated statement—is not relevant in this case. When evaluating this factor, we look to objective action rather than a party's litigation position. *See, e.g.*, *Garcia*, 16 F.3d at 344 (relying on the delivery of the same amount of drugs discussed by the translator); *Nazemian*, 948 F.2d at 528 (a series of "repeated, lengthy meetings," indicating that all parties were content with the quality of the translator). Romo-Chavez's post hoc, self-serving denial is insufficient to tip this factor in his favor.

**[7]** Taking these factors together, the district court did not

---

**4**We recognize the concurrence's concerns about Hernandez's language abilities, but Judge Zapata was in a far better place to determine what those abilities were than we are reviewing a cold record. Speculation about what "Romo-Chavez actually . . . may have" said, post at 5694, does not demonstrate that Judge Zapata's factual determination that the officer was capable of translating these statements was clearly erroneous.

err in concluding that Officer Hernandez served merely as a language conduit for Romo-Chavez.[5]

### B

**[8]** The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. However, this right is not implicated here because Officer Hernandez's translations are properly construed as Romo-Chavez's own statements. *Nazemian*, 948 F.2d at 525-26. Even if it were, however, it was satisfied by Officer Hernandez's appearance at trial. He may not have remembered the interview, but " '[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.' " *United States v. Owens*, 484 U.S. 554, 558 (1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 21-22 (1985) (per curiam)). All the Confrontation Clause requires is the ability to cross-examine the witness about his faulty recollections. *Id.*; *see also Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").

### III

**[9]** Romo-Chavez next challenges the district court's refusal to instruct the jury to infer from the government's destruction of certain personal property that it would have yielded evidence harmful to the government. But to warrant

---

[5]Romo-Chavez's fallback argument relating to the agents's failure to record is similarly without merit. Whether or not a recording is made has no bearing on whether the translator's statements may be fairly attributed to the defendant. And as we have routinely said, suppression is not warranted simply because the government fails to record an interview. *United States v. Smith-Baltiher*, 424 F.3d 913, 925-26 (9th Cir. 2005).

such an instruction, a criminal defendant must establish (1) that the evidence was destroyed in bad faith, and (2) that he was prejudiced by its destruction. *United States v. Artero*, 121 F.3d 1256, 1259 (9th Cir. 1997); *United States v. Jennell*, 749 F.2d 1302, 1308-09 (9th Cir. 1984); *accord Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010) (stating that an adverse inference "instruction usually makes sense only where the evidence permits a finding of bad faith destruction; ordinarily, *negligent* destruction would not support the logical inference that the evidence was favorable to the defendant"); *Lunnon v. State*, 710 A.2d 197, 199 n.3 (Del. 1998) (adopting a different rule under state law but describing federal rule as a "bright line due process test of police bad faith").

We acknowledge that our standard in civil cases differs somewhat. But the bad faith requirement, absent from the general civil standard, exists in criminal cases because it "limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it." *Youngblood*, 488 U.S. at 58; *see also Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (per curiam).

**[10]** As Romo-Chavez concedes, there was no bad faith shown in this case. Therefore, the district court did not err.

## IV

Finally, Romo-Chavez argues that even if he was not prejudiced by any single error, the cumulative effect of multiple errors requires reversal. Because the district court committed no error, Romo-Chavez cannot be entitled to such relief. *United States v. Jeremiah*, 493 F.3d 1042, 1047 (9th Cir. 2007).

**AFFIRMED.**

BERZON, Circuit Judge, concurring:

I disagree with the majority as to the question whether Agent Hernandez spoke Spanish well enough that he could reasonably be viewed in his role as out-of-court translator as a "conduit" for Romo-Chavez, thereby precluding application of the hearsay rule with regard to the statements he made to Agent Simboli. In the context of the rest of the record in this case, however, the admission of Agent Hernandez's translation was harmless. I therefore concur in the result as to the *Nazemian* issue. *See United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991). I also concur in the remainder of the majority opinion, albeit with the same caveat regarding the survival of *Nazemian* after *Crawford v. Washington*, 541 U.S. 36 (2004), as I expressed in *United States v. Hieng*, ___ F.3d ___, No. 09-10401, 2012 WL 1655934 (9th Cir. May 11, 2012) (Berzon, J., concurring).[1]

I.

The record establishes that Hernandez's grasp of Spanish was quite weak — much weaker than the majority opinion makes it out to be.

---

[1] In *Hieng*, I state in my concurring opinion that *Nazemian* is not so " 'clearly irreconcilable' " with *Crawford*, as to permit a three-judge panel to overrule *Nazemian*. 2012 WL 1655934, at *11 (Berzon, J., concurring) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)). In particular, *Nazemian* places the translator's version of a statement beyond the scope of Confrontation Clause analysis altogether, a holding that would, if correct, seem to survive the fundamental alteration in Confrontation Clause analysis wrought by *Crawford*. Nonetheless, as I explain in my concurring opinion in *Hieng*, I am of the view that *Nazemian*'s holding does ultimately rest on a pre-*Crawford* understanding of the unity between hearsay concepts and Confrontation Clause analysis. *See id*. at *15 (Berzon, J., concurring). The notion that a translator's out-of-court version of a testimonial statement need not be subject to cross-examination seems in great tension with *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009) and *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), which hold that laboratory reports may not be admitted without testimony by the persons who conducted the laboratory tests. *Id*.

For example, although the opinion says that Hernandez "grew up . . . speaking Spanish," Hernandez actually testified that he "grew up listening to Spanish." In other words, Hernandez's parents spoke to him in Spanish. Many people grow up with relatives speaking to them in another language, which they can therefore understand to a degree but not necessarily speak. *See* Friedemann Pulvermüller & John H. Schumann, *Neurobiological Mechanisms of Language Acquisition*, 44 *Language Learning* 681, 685 (1994); *see also* Lily Wong Filmore, *When Learning a Second Language Means Losing the First*, 6 Early Childhood Res. Q. 323, 324 (1991) (observing that "[f]ew American-born children of immigrant parents are fully proficient in the[ir] ethnic language" and that "[o]nce these children learn English, they tend not to maintain or to develop the languages spoken at home, even if it is the only one their parents know"); Merrill Swain, *The Output Hypothesis and Beyond: Mediating Acquisition through Collaborative Dialogue*, *in Sociocultural Theory and Second Language Learning* 97 (James P. Lantolf ed., 2000) (discussing studies showing that the "output" of language through speaking and writing is critical to the acquisition of a foreign language).

Further, the opinion leaves the impression that Hernandez studied Spanish extensively; in fact, he did so only from fifth to seventh grade and then, again, for two years in high school, which he completed in the 1980s. Unfortunately, language teaching and learning in this country are such that this degree of education in a language is extremely unlikely to lead to any degree of fluency. *See, e.g.*, Center for Applied Second Language Studies, Univ. of Or., *What Proficiency Level Do High School Students Achieve?* 2 (2010) (reporting that, after four years of high school level foreign language instruction in the United States, fewer than four percent of students achieve an "intermediate mid"[2] level of speaking proficiency).

---

[2]The American Council on the Teaching of Foreign Languages (ACTFL) has characterized foreign language speakers at the "intermediate

Similarly, the majority opinion embroiders the record, at least by implication, when it says that Hernandez spoke Spanish at home with his first and second wives. Hernandez did testify that both of his wives spoke Spanish, and that he speaks Spanish daily in his personal life. But he also testified that both of his wives spoke English too, and that he could "communicate very easily" with them in English. It is thus unclear whether Hernandez's "daily" use of Spanish at home consisted of a few words or phrases a day, or whether he spoke Spanish extensively with his wives. His demonstration of his Spanish abilities at the trial, discussed below, suggests the former.

No more convincing as to Hernandez's fluency in Spanish is the majority's statement that Hernandez conducted interviews in Spanish on a regular basis. In fact, Hernandez testified that he had conducted only around 20 investigative interviews for border agents, of the type at issue here, in the past three years. Hernandez's main use of Spanish at work consisted instead of taking sworn statements, including "biographical questions and such," while processing non-U.S. citizens at the passport control station at the border. Given the disparate contexts of passport control and criminal interrogation, it is difficult to see how Hernandez's experience in taking sworn statements adequately equipped him with the Spanish language skills necessary to interpret Agent Simboli's interrogation of Romo-Chavez. Moreover, there is no indication in the record as to the *accuracy* with which Her-

---

mid" level as those capable of "handl[ing] successfully a variety of uncomplicated communicative tasks in straightforward social situations," whose "[c]onversation is generally limited to those predictable and concrete exchanges necessary for survival in the target culture," who "have difficulty linking ideas, manipulating time and aspect, and using communicative strategies" when called on to perform functions or handle topics at the advanced level, and who "are generally understood by sympathetic interlocutors accustomed to dealing with non-natives." Am. Council on the Teaching of Foreign Lang., *ACTFL Proficiency Guidelines* 7 (2012).

nandez either translated interrogations or took sworn statements.

Hernandez's trial testimony confirmed that his command of Spanish was far from dependable. Quite aside from the request that he recite from memory the Spanish version of *Miranda* warnings — a task that did not necessarily depend on language proficiency,[3] as the majority notes — Hernandez was asked to translate in court a short (around 60-word) "waiver of rights" from the ICE *Miranda* form that he had gone over with Romo-Chavez. His translation was then compared with that of the court interpreter. The two translations were generally consistent, but were inconsistent in some ways that could matter when reporting what a potential criminal defendant said about his activities.

For example, the court interpreter translated the phrase "me han leido" as "they have read to me," whereas Hernandez translated it is "I have read." Obviously, such a transposition of subject and object could matter mightily when a suspect is giving his story in reponse to questioning. Similarly, Hernandez translated a phrase as "I sign this document," whereas the interpreter translated it as "I have signed this document." As with the subject/object error, this kind of verb tense mistake is one that someone with a good grasp of Spanish should not be making. Moreover, it is again the kind of error that could result in a suspect being represented as having told one story whereas in fact he told another, with a material discrepancy between the two.

---

[3]Nonetheless, Hernandez did make mistakes that reflected on his Spanish abilities while attempting to perform this task. For example, he translated the word "questions" as "preguntos" rather than "preguntas," thereby mistaking the gender of the noun. Such an error is not necessarily innocuous. For example, the Spanish term "derecha" means "right," as in the opposite of "left," whereas the term "derecho" means "right," as in a human right or constitutional right. *See Oxford Spanish Dictionary* 256 (3d ed. 2003).

Nor were these errors momentary lapses. Hernandez testified that he didn't know "the grammar rules for application to the Spanish language." He also indicated that he relied on his wife for help with tenses when trying to complete sentences. For instance, she would correct him if he confused the phrase "I wanted to go" with "I went."

While Hernandez testified that he "more commonly" made mistakes in verb tense, the cross-examination revealed that his Spanish vocabulary also had significant limitations. At one point, for example, Romo-Chavez's attorney asked Hernandez to translate four sentences from Spanish to English, which the court interpreter subsequently translated as, "I am Juan Dominquez. I live there near Phoenix. I'm going on a trip for pleasure and business. But in this business I had an accomplice that already gave a statement." Hernandez was able to translate only the first two sentences. Explaining his inability to translate the third and fourth sentences, Hernandez stated, "I have never heard those words before." Translation is an exacting task, for which professional translators train for many years. *See generally* Bureau of Labor Statistics, *Interpreters and Translators*, *in Occupational Outlook Handbook* (2010-11 ed.), *http://www.bls.gov/oco/pdf/ocos175.pdf.*; *Developing Professional-Level Language Proficiency* (Betty Lou Leaver & Boris Shekhtman eds., 2002). Even fully competent translators and interpreters disagree about the proper transformation of one language into another; that is why there are over ten translations of *War and Peace*, for example, listed for sale by Amazon. While we need not hold that an out-of-court translator must be qualified to be a court interpreter — or a translator of novels — to meet the *Nazemian* standard, some high degree of reliability is necessary. The very concept of a "conduit" — especially where the defendant had nothing to do with choosing the translator — suggests accuracy, if not elegance, in converting what the defendant said in one language to another. Where the interpreter's background and tested proficiency does not confirm the capacity for such accuracy, the entire premise on which *Nazemian*

stands — shaky though it may be with regard to the Confrontation Clause after *Crawford*, 541 U.S. 36, *see Hieng*, 2012 WL 1655934, at *15 (Berzon, J., concurring) — collapses.

Romo-Chavez testified that he understood only 30-40% of what Hernandez said to him, which would have consisted primarily of *Miranda* warnings and questions. Of course, there is ample reason to think this estimate self-serving. But even if Hernandez's accuracy, or comprehensibility, was much higher, there could easily have been mistakes in translation concerning grammar and verb tense that mattered.

For example, with respect to the question of where Romo-Chavez planned to exchange the two shirts, Simboli testified that Hernandez told him that Romo-Chavez first said Phoenix but then changed his answer to the Tucson Mall. However, what Romo-Chavez actually said may have been that he *would have gone to* the Tucson Mall had he not had other business in Phoenix. Alternatively, he might have said that he *had been to* the Tucson Mall before (which, as Romo-Chavez testified during trial, he *had been*) but was going near Phoenix this time.[4] Of course, we don't know that he said either one, but the sorts of verb tense errors we know Hernandez did make could lead to such mistakes.

Similarly, even a subtle misuse of vocabulary could have mattered here. For example, Simboli testified that, in response to a question he did not quite remember, Romo-Chavez told him, "Everything in the car is mine." In contrast, Romo-Chavez testified that he told Simboli, through Hernandez, only that the clothes and documents in the car were his. Whereas Simboli may have intended to ask whether Romo-Chavez acknowledged ownership of everything in the *entire* car (that is, including the gas tank), the question that Hernandez posed to Romo-Chavez, given Hernandez's word use

---

[4]Romo-Chavez agreed that he "went to a place near Phoenix, Scottsdale," and that he was "going to go to Dillard's in Scottsdale."

difficulties, may actually have been whether he owned everything inside the car—that is, the interior cabin. Such a discrepancy could constitute the difference between a seeming confession and an innocuous admission.

I explained in my concurrence in *Hieng* that *Nazemian* should be reconsidered en banc in an appropriate case with regard to its Confrontation Clause holding. *See* 2012 WL 1655934, at *15 (Berzon, J., concurring). But, as this case illustrates, *Nazemian* will retain importance as a hearsay precedent even if it is determined that the Confrontation Clause requires that the interpreter be available for cross-examination. Here, Hernandez was available for cross-examination and was extensively cross-examined. He did not, however, remember any details of this particular interpretation session, as is understandable and as will often be the case. As the majority holds, the Confrontation Clause is satisfied by the opportunity to cross examine, even if the person examined does not remember enough to be useful. Maj. Op. at 5687. So, in this species of case, it is often compliance with the *Nazemian* requisites—particularly, enough language competence that the interpreter's statements can be viewed as those of the suspect (or other interviewee)—that will be the protection against inaccurate translation prejudicial to the defendant.

Obviously, precisely because the defendant does not know English, he is in no position to judge the accuracy of the translation at the time it is occurring. Where, as here, his defense at trial is, in part, that he did not say during the out-of-court interview what the translator says he said, some meaningful assessment of the language competence of the translator is essential. Hernandez was not sufficiently competent that he could be viewed as a "conduit" such that his statements could be taken as those of Romo-Chavez, eliminating what would otherwise be a hearsay problem. Indeed, Hernandez conceded at trial that he did not consider himself to be fluent in Spanish.

One additional note: It does not seem to me to be too much to ask to require that the Department of Homeland Security (DHS) have competent, trained interpreters available at the border to interview suspects (and others), at least in Spanish. Or, better, DHS could record all the interrogations, so that the actual interchange can be available to the parties and the jury (with the help of certified interpreters). Alternatively, law enforcement can wait to interview arrested suspects until there is a competent intermediary available. Here and in many other instances, what was found in the car was sufficient to establish probable cause and therefore to arrest Romo-Chavez; there was no exigent reason to interview him before a competent interpreter could be found.

Errors in translation do occur, and can be critical. *See, e.g.*, *Grigoryan v. Mukasey*, 277 Fed. Appx. 742, 744 (9th Cir. 2008) (granting a motion to reopen an alien's removal proceedings, where a hearing transcript incorrectly stated that "[the alien] testified to being attacked because her mother was a 'cook' rather than a 'Turk,' " an error that went to "the heart of her claim" of having been persecuted based on a protected ground). This court has recognized that "an incorrect or incomplete translation is the functional equivalent of no translation." *Perez-Lastor v. INS*, 208 F.3d 773, 778 (9th Cir. 2000). We should not bend the hearsay rules out of shape so as to treat statements by one person as if they were statements by another, unless the equivalence is proven. Here, it was not.

## II.

In the end, however, I would hold the error in admitting Hernandez's hearsay statements in this case to be harmless error, for three reasons.

First, Agent Simboli's testimony of what Romo-Chavez said, via Hernandez's translation, did not contain any specific admission from Romo-Chavez that he knew of the drugs in the gas tank. Instead, the government used Simboli's testi-

mony only to attack through contradictions the story Romo-Chavez told at trial. And much of what Agent Simboli reported that Romo-Chavez told him — or did not tell him — via Hernandez was similar to what two other border agents, Agents Tipling and Aldrich, who separately spoke to Romo-Chavez, reported. Romo-Chavez does not challenge Agent Tipling's or Agent Aldrich's reports of what he said in Spanish as hearsay. Both officers, like Agent Simboli, for whom Hernandez translated, testified to statements that contradicted Romo-Chavez's story at trial.

Moreover, Romo-Chavez's story at trial changed drastically during cross-examination, as he was confronted with evidence concerning his ongoing relationship with Vargas-Diaz, the individual who, according to Romo-Chavez's testimony, must have placed the drugs in the car he drove across the border. For example, Romo-Chavez initially testified that he ran into Vargas-Diaz only one time, by coincidence, in Nogales. Later, however, he admitted to meeting Vargas-Diaz in Nogales between six to eight times. Similarly, Romo-Chavez at first claimed to have never called Vargas-Diaz, but subsequently said that he had called him about three times. At the outset, Romo-Chavez also said that the two ran into each other by coincidence at the Tucson Mall, but he later admitted that Vargas-Diaz knew that he would be there, because the men had spoken beforehand by phone.

The government also introduced extensive evidence that Romo-Chavez and Vargas-Diaz drove the same two cars across the border at different times. Romo-Chavez made a total of about thirteen trips across the border in those two cars, while Vargas-Diaz made a total of about twelve trips. In addition, the government presented evidence that the two men crossed the border simultaneously approximately thirteen times, evidence inconsistent with Romo-Chavez's representations that he knew Vargas-Diaz very casually and had no role in any cross-border transactions in which he engaged.

Given these aspects of the record, as well as the basic fact that drug smugglers are unlikely to entrust hundreds of thousands of dollars of drugs to an unknowing driver, *cf. United States v. Toro-Barboza*, Nos. 10-50487, 10-50491, 2012 WL 833905, at *4 (9th Cir. Mar. 14 2012), the jury likely would have disbelieved Romo-Chavez's version of events even without the report of Simboli's interrogation. If they did, then there was ample evidence from which the jury could have inferred that Romo-Chavez was working with, rather than duped by, Vargas-Diaz, whom he identified as the source of the car and of the drugs.

Finally, Romo-Chavez had ample opportunity to cross-examine Hernandez as to his language competence. Given the lack of competence Hernandez both displayed and admitted to, the likelihood that the jury put much credence in Simboli's report, as opposed to all the other evidence, is quite low.

Critically, the *Nazemian* error was an evidentiary one only, not of constitutional dimensions. So the government's harmless error burden is only to show it is more likely than not that the same result would have been reached absent Agent Simboli's report of his interrogation of Romo-Chavez. *See United States v. Gomez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005). In combination, the strength of the government's circumstantial evidence, the many other reasons that the jury had for disbelieving Romo-Chavez's testimony, and the effective cross-examination of Hernandez regarding his Spanish competence, more than meet the government's burden of demonstrating that the evidentiary error was harmless.

## *Conclusion*

For the reasons I have explained, I concur only in the result with regard to the *Nazemian* issue.

The district court characterized the competence of the translator as "marginal." I believe even that begrudging char-

acterization to be clearly erroneous, for the reasons I have given. But even if not clearly erroneous, the district court's assessment of Hernandez's ability as an interpreter is surely one as to which another district judge could have ruled otherwise without committing clear error. Thus, if DHS continues to provide translators who are untrained, untested, and of, at best, "marginal" competence, and also continues not to record interrogations involving an interpreter, it will be unnecessarily risking the validity of the resulting convictions.