No. 120,339

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GELDY GUTIERREZ-FUENTES,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under the Sixth Amendment, whether a delay between arrest and trial is presumptively prejudicial for purposes of the defendant's constitutional right to a speedy trial is determined by the factual circumstances of each case rather than by a bright-line time frame. The delay analysis varies based on the complexity of the case.

2.

When the record contains no evidence of a motive to mislead by an interpreter or other evidence questioning an interpreter's neutrality and the declarant testifies at trial, evidence of a neutral third-party's interpreted statements is attributed to the declarant without an additional layer of hearsay under the language conduit rule.

3.

When a party submits a jury instruction on the elements of a charge with language broader than the charging document, and that instruction is later used by the court without objection, the invited error doctrine may bar an appellate court's consideration of that party's instructional error claim.

1

Appeal from Sedgwick District Court; DEBORAH HERNANDEZ MITCHELL, judge. Opinion filed November 25, 2020. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., WARNER, J., and ROBERT J. WONNELL, District Judge, assigned.

WONNELL, J.: After law enforcement investigated personal injuries and property damage associated with an incident at an apartment complex on October 5, 2016, the State charged Geldy Gutierrez-Fuentes with one count of rape, one count of aggravated battery, one count of aggravated burglary, and one count of criminal threat. He was arrested on February 3, 2017, and the State filed an amended information on March 29, 2017, adding a second count of aggravated battery. After a series of continuances, Gutierrez-Fuentes' jury trial began on August 21, 2018. The jury found Gutierrez-Fuentes not guilty of rape and guilty on the remaining charges. On October 12, 2018, the district court sentenced Gutierrez-Fuentes to a controlling sentence of 82 months' imprisonment. He timely appeals.

FACTUAL BACKGROUND

On October 5, 2016, the Wichita Police Department received two 911 calls asking for assistance at D.S.'s address and reporting that a woman had been hit in the face and was bleeding. When Officer Dane Myers arrived, he saw D.S. sitting on the stairs outside her apartment building with "blood all over her face and . . . on her hand." Because D.S. did not speak English, Myers obtained D.S.'s name and apartment number from a neighbor and went to the scene to find the door had been forced open and a piece of the

2

door frame was lying on the ground. When Myers went into the apartment, he saw what appeared to be blood on the wall by a light-switch plate next to the door. D.S. was later transported to the hospital.

When Myers arrived at the hospital, D.S. was speaking with hospital personnel through an interpreter and with help from her Spanish-speaking neighbor. Myers relied on the hospital interpreter and D.S.'s neighbor to relay questions and answers between D.S. and himself. Ultimately, D.S. underwent surgical repairs for the injuries, including the implantation of six titanium plates in her face.

Myers testified that D.S. said that she had broken up with Gutierrez-Fuentes the day before—October 4, 2016—and she had been afraid he would come back to hurt her, so she had spent the previous night away from her apartment. After she returned home the next day, Gutierrez-Fuentes came to the apartment and said he was going to kill her and punched her in the face repeatedly. D.S. also testified that while hitting her, Gutierrez-Fuentes told her that "if [she] was not going to be with him that he could kill [her]," and D.S. was afraid that she was going to die. D.S. testified that she did not know why Gutierrez-Fuentes stopped hitting her and she did not remember Gutierrez-Fuentes leaving; she thought that she blacked out and when she came to, she was on the floor in her living room, bleeding. Myers testified that during this conversation with D.S. he noticed her eye had begun to swell shut.

Through the use of an interpreter, D.S. was examined by forensic nurse Tracy Hess the day after the incident. D.S. described the incident and her violent relationship with Gutierrez-Fuentes and concluded the conversation by stating that "he finally stopped when he saw there was a lot of blood and he left and then she went out and the neighbor had called 911." D.S. also told Hess that earlier that week, Gutierrez-Fuentes had come to her home and "wanted sex and she was afraid to say no, so she said she just took a deep

3

breath and let him have sex with her." D.S. said she felt like she was coerced to have sex with Gutierrez-Fuentes and that she only did so out of fear.

That same day, D.S. spoke with Wichita police officer Rick Peña, who speaks Spanish and is an interpreter for the Wichita Police Department. Peña testified that D.S. said she and Gutierrez-Fuentes had dated for about three months and that two days before the incident, Gutierrez-Fuentes came to her apartment, entered with a key she had given him, woke her up, and had sex with her "against her will."

A week later, Officer Peña and Detective Heather Huhman met with D.S. At this point, D.S. clarified that she had given Gutierrez-Fuentes a key to her apartment but she had "rigged" the door so that it could not be easily opened from the outside even with a key. She affirmed that "she felt like she was going to be killed" during the attack on October 5.

On October 31, 2016, the State charged Gutierrez-Fuentes with one count of rape, one count of aggravated battery, one count of aggravated burglary, and one count of criminal threat. Gutierrez-Fuentes was arrested on February 3, 2017, and the district court appointed counsel to represent him soon after. On March 29, 2017, the State filed an amended information, adding a second count of aggravated battery. Gutierrez-Fuentes pleaded not guilty to all charges.

After a series of continuances and two changes of appointed defense counsel, Gutierrez-Fuentes' jury trial began on August 21, 2018. The State presented evidence from Linda Ester, a Sedgwick County 911 records custodian, and the two 911 calls from October 5, 2016. D.S., Peña, Huhman, and Myers also testified.

4

The jury viewed Myers' body camera footage of his actions at D.S.'s apartment, his conversation with D.S. at the hospital, and photographs of D.S.'s apartment. On cross-examination, Myers testified that D.S. did not state that Gutierrez-Fuentes forced her to have sex.

Doctor Timothy Benning testified about D.S.'s injuries and opined that such injuries do not commonly occur together as the result of a single impact. Rather, the cheekbone fracture was consistent with someone being punched on the cheekbone and the orbital fracture was consistent with a direct blow to the eyeball itself. Benning agreed that D.S.'s injuries amounted to "getting your face crushed" and that she suffered "significant" injuries.

Hess testified that D.S.'s genital examination showed no sign of acute injury, but "[i]t's fairly common that there's no injury with sexual intercourse." She stated that D.S. did not tell her that Gutierrez-Fuentes used force to rape her; rather, D.S. said she was overcome by fear. Hess testified that there was nothing in her examination of D.S. inconsistent with the history D.S. reported to her. On cross-examination, Hess acknowledged that there was nothing in her examination of D.S. inconsistent with the theory that D.S. had not been raped and she agreed that she had "no idea" whether D.S. was raped. The State introduced into evidence and published to the jury 27 photographs Hess took of D.S. during the examination.

D.S. said that she did not report the initial attack to police because she was afraid. When asked what she was afraid of, she replied, "I don't know. I just—I tell him to leave and he left and I thought that was the end of it." However, D.S. also said that Gutierrez-Fuentes came to the apartment on October 4 to retrieve his belongings and she asked Gutierrez-Fuentes for his key to the apartment, but he said that he had lost it.

5

Gutierrez-Fuentes presented no evidence. During closing argument, defense counsel focused on the rape charge, arguing insufficient evidence and emphasizing the inconsistencies in the evidence. After less than three hours of deliberation, the jury reached a verdict, finding Gutierrez-Fuentes not guilty of rape, guilty of the two counts of aggravated battery, guilty of aggravated burglary, and guilty of criminal threat. On October 12, 2018, the district court sentenced Gutierrez-Fuentes to a controlling sentence of 82 months' imprisonment. He timely appeals.

DID THE STATE VIOLATE GUTIERREZ-FUENTES' CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL?

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." This provision applies in state court through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *State v. Owens*, 310 Kan. 865, 869, 451 P.3d 467 (2019) (citing *Klopfer v. North Carolina*, 386 U.S. 213, 222-23, 87 S. Ct. 988, 18 L. Ed. 2d 1 [1967]). The Kansas Supreme Court recently found that a 19-month delay did not violate a defendant's constitutional right to a speedy trial. 310 Kan. at 866. The court reached this decision after applying the four nonexclusive factors of length of delay, reason for delay, the defendant's assertion of his right, and prejudice. 310 Kan. at 869 (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 [1972]).

Courts consider these factors together with all relevant circumstances and none of the four factors is an independently sufficient reason to find a violation. See 310 Kan. at 869. That being said, "the United States Supreme Court has explained the [length of] delay factor is 'to some extent a triggering mechanism. Until there is some delay which is

presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" 310 Kan. at 872 (quoting *Barker*, 407 U.S. at 530).

The State first filed charges against Gutierrez-Fuentes on October 31, 2016, but he was not brought to trial until August 21, 2018. Gutierrez-Fuentes argues that this length of time violated his constitutional right to a speedy trial. The State disagrees.

*Preservation*

Gutierrez-Fuentes contends that he properly preserved the constitutional speedy trial issue for appellate review because defense counsel asserted his right to a speedy trial and because Gutierrez-Fuentes "personally repeatedly objected to delays in his trial process." The record is unclear on when exactly Gutierrez-Fuentes objected to the delay in the proceedings. Gutierrez-Fuentes argues two places in the record on appeal, both of which occurred more than 18 months after charges were filed. First, he cites a June 15, 2018 hearing at which defense counsel stated: "I just want to make sure the record reflects that we are not acquiescing into this continuance, we still are asserting our right to a speedy trial and we want to make sure that this is preserved for the record in case this ends up on appeal." Second, he cites a July 18, 2018 hearing when his counsel was ill and not able to attend, at which he personally informed the court: "I've been here for a year and five months and nothing." And he asked the court about his pro se motion regarding speedy trial. With these two statements, Gutierrez-Fuentes asserts on appeal that "[b]ecause [he] objected to continuances and invoked his right to a speedy trial, this issue is properly before this court."

Speedy trial is both a statutory and constitutional claim. See K.S.A. 2019 Supp. 22-3402. Gutierrez-Fuentes argues in his brief that the delay violated his constitutional right to a speedy trial. As Gutierrez-Fuentes does not argue that his statutory right to

speedy trial was violated, we deem this issue abandoned for the purposes of appeal. See *State v. Littlejohn*, 298 Kan. 632, 655-56, 316 P.3d 136 (2014). The constitutional argument was not raised in the district court at trial and is being presented for the first time on appeal. Accordingly, Gutierrez-Fuentes did not properly preserve a constitutional speedy trial right for appellate review. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) (holding that a party generally may not raise constitutional grounds for reversal for the first time on appeal).

That being said, there are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including when appellate courts must consider the theory to prevent the denial of fundamental rights. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34) requires an appellant to explain why an appellate court should consider for the first time an issue not raised below. Gutierrez-Fuentes argues that this court should consider his constitutional speedy trial issue for the first time on appeal because "failure to reach the issue would result in the denial of a fundamental right." The United States Supreme Court has held that "the right to a speedy trial is 'fundamental.'" *Barker*, 407 U.S. at 515. So Gutierrez-Fuentes may raise the issue on appeal despite his failure to raise it in the district court at trial.

*Standard of Review*

The parties agree that this court exercises unlimited review over constitutional speedy trial claims. But in December 2016, more than 10 years after either of the cases the parties cite for the standard of review, the Kansas Supreme Court noted that "while the district court's application of *Barker* to a particular set of facts is a question of law, *what the set of facts is seems to be a question for the district court*." (Emphasis added.) *In re Care & Treatment of Ellison*, 305 Kan. 519, 533, 385 P.3d 15 (2016). Thus, "[t]he

8

factual findings underpinning a district court's decision regarding a defendant's constitutional speedy trial right are reviewed for substantial competent evidence, but the ultimate legal conclusion drawn from those facts is reviewed de novo." *Owens*, 310 Kan. at 868 (citing *In re Care & Treatment of Ellison*, 305 Kan. at 533-34).

Because Gutierrez-Fuentes did not raise a constitutional speedy trial issue in the district court at trial, the district court had no opportunity to make any factual findings related to the *Barker* factors. And "it is not our job to engage in fact-finding." *State v. Rizal*, 310 Kan. 199, 204, 445 P.3d 734 (2019). However, for the reasons stated below, a remand is not required for additional factual findings as the delay in this case was not presumptively prejudicial and Gutierrez-Fuentes makes no argument that he suffered any actual prejudice as required.

*Analysis regarding prejudice*

Whether the length of delay between arrest and trial is presumptively prejudicial depends on the peculiar circumstances of each case, and the mere passage of time is not determinative. *State v. Weaver*, 276 Kan. 504, Syl. ¶ 3, 78 P.3d 397 (2003). Additionally, the "tolerable delay for an ordinary crime is less than for a complex one." 276 Kan. at 511. As stated above, the *Owens* court instructs us that this threshold must first be met prior to a discussion of the *Barker* factors.

Under the Sixth Amendment, whether a delay is presumptively prejudicial is determined by the factual circumstances of each case rather than by a bright-line time frame. The delay analysis is different based on the complexity of the crime. See *Owens*, 310 Kan. at 872-73 (citing *Barker*, 407 U.S. at 530-31). In its brief, the State argues that all of the continuances, save the last three-and-one-half months, were attributable to the defendant and the delay was not presumptively prejudicial. However, the length of delay

is a factor for consideration after the threshold has been met, and *Owens* points out that we are not to blur the lines between the two levels of analysis.

The Kansas Supreme Court has found a 23-month delay was not presumptively prejudicial in a complex murder trial. See *State v. Mathenia*, 262 Kan. 890, 895, 942 P.2d 624 (1997). Here, the case involved investigations into rape, aggravated battery, and criminal threat. The trial included testimony from multiple police officers and physicians and involved significant questions regarding the facts related to each charged crime. Trial occurred approximately 22 months after charging and approximately 18 months after arrest. Based on the complexity of the case, we hold that the 18-month delay was not presumptively prejudicial.

However, even if the delay was presumptively prejudicial, Gutierrez-Fuentes offers no explanation or argument regarding actual prejudice suffered. He argues that he was appointed three different attorneys during his time in custody and the last one was appointed less than one month before trial. However, Gutierrez-Fuentes makes no argument as to why having three attorneys or when the appointment occurred impaired the defense or resulted in prejudice.

The State makes three arguments regarding this issue. First, Gutierrez-Fuentes does not identify any specific prejudice. Second, an immigration hold was in place for Gutierrez-Fuentes. Lastly, there was no claim that the defense was impaired by the length of the delay. Gutierrez-Fuentes did not file a reply brief rebutting or addressing these points. The State correctly points out that incidentally mentioning a point is insufficient. See *Brubaker v. Branine*, 237 Kan. 488, 490, 701 P.2d 929 (1985). As a result, Gutierrez-Fuentes has abandoned any argument regarding actual prejudice from the delay, which is dispositive of this issue, and no further fact-finding from the district court is necessary.

The district court did not violate Gutierrez-Fuentes' Sixth Amendment right to a speedy trial.

### WAS THERE SUFFICIENT EVIDENCE TO SUPPORT GUTIERREZ-FUENTES' AGGRAVATED BURGLARY CONVICTION?

Gutierrez-Fuentes argues that there was insufficient evidence to support his aggravated burglary conviction. The State charged Gutierrez-Fuentes with aggravated burglary under K.S.A. 2016 Supp. 21-5807(b)(1), which prohibits "without authority, entering into . . . any . . . [d]welling in which there is a human being, with intent to commit a felony, theft or sexually motivated crime therein." Gutierrez contends that the State failed to prove that he was legally unauthorized to be in D.S.'s apartment. The State disagrees.

> "Appellate courts review sufficiency claims in a criminal case to determine whether '"a rational factfinder could have found the defendant guilty beyond a reasonable doubt."' In making this determination, appellate courts view the evidence in the light most favorable to the State, which means the court '"does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility." [Citations omitted].'" *State v. Williams*, 308 Kan. 1439, 1443, 430 P.3d 448 (2018).

Gutierrez-Fuentes argues that even under this standard of review there is insufficient evidence to show that he was unauthorized to enter the apartment, citing *State v. Vasquez*, 287 Kan. 40, 194 P.3d 563 (2008). Among other things, Vasquez was charged with committing aggravated burglary in December 1998 by "entering into or remaining within [his wife] Robin's house with the intent to commit first-degree murder." 287 Kan. at 43. Vasquez and Robin married in 1996, but "by mid-1998, Robin was seeking a divorce." 287 Kan. at 44. In October 1998, Vasquez went to Mexico to harvest crops on his land; while there, he contacted Robin, who "told him she did not want him to

return." 287 Kan. at 44. While Vasquez was gone, Robin "moved his belongings to the home of Vasquez' sister," and when Vasquez returned to Kansas in the first week of December 1998, he stayed at his sister's home. 287 Kan. at 44. Vasquez was convicted of the aggravated burglary charge and on appeal he argued that there was insufficient evidence that he lacked authority to enter Robin's house.

The Kansas Supreme Court reasoned:

"Our opinion in *State v. Franklin*, 280 Kan. 337, 345-46, 121 P.3d 447 (2005), is helpful in deciding this issue. In that case, a majority of this court reversed the aggravated burglary conviction of a former live-in girlfriend who entered her former boyfriend's residence and attacked his current paramour. Evidence of lack of authority was insufficient when the defendant had testified that she had permission to be in the residence, and that she had clothes in the residence and a car in its garage. In response, the State had relied on the timing of the attack, 1:54 a.m., as well as the defendant's lack of conversation with residents on the night of the attack, her estrangement from the boyfriend, and her failure to visit the residence in the previous several weeks.

"Viewing all of the evidence in this case in the light most favorable to the prosecution, the State certainly demonstrated that Robin wanted nothing to do with Vasquez. She had asked him to stay in or go back to Mexico; and she had moved at least some of his belongings out of their house and into his sister's. Yet the State did not prove that on December 11, 1998, Vasquez was legally unauthorized to enter the house he and Robin had lived in together. Robin may have obtained a restraining order or may have planned to file a PFA action, as she told [the police officer], but there was no evidence that Vasquez had been served with any order of this type. He was still married to Robin. Although [the officer's] discouragement of contact with Vasquez' wife was good advice, it lacked the force of law. In keeping with our *Franklin* decision, we hold that the evidence at trial was insufficient to show Vasquez lacked authority to enter Robin's house. His conviction on aggravated burglary must therefore be reversed and its corresponding sentence vacated. [Citations omitted.]" *Vasquez*, 287 Kan. at 59-60.

12

Gutierrez-Fuentes argues that the evidence the State presented at his trial is analogous to that presented in *Vasquez*. There was evidence that D.S. and Gutierrez-Fuentes had lived together in the apartment for four months, and D.S. testified that she no longer wanted Gutierrez-Fuentes in the apartment after their breakup on October 4, 2016. He asserts that under *Vasquez*, this court must reverse his aggravated burglary conviction.

This case is distinguishable from *Vasquez*. Unlike the case at bar, the residence in *Vasquez* was a shared marital home. See 287 Kan. at 60. Vazquez had not been previously asked to return his key, as Gutierrez-Fuentes had been. D.S. and Gutierrez-Fuentes were not married, and the record contains no evidence that he had any property rights in the residence.

The State requests this court to apply the Kansas Supreme Court's more recent holding in *Williams*. In that case, the defendant and victim were dating and the aggravated burglary in question occurred at the victim's home. The *Williams* court focused on the property rights of the *victim*, noting that "someone with a property interest—as an owner or lessee, for example—has the right to exclude others from the property." 308 Kan. at 1445. It acknowledged that in certain cases, such as *Vasquez*, it had held that the State failed to prove a lack of authority since both the defendant and the victim had a property interest in the residence. 308 Kan. at 1446. And the *Williams* court further acknowledged that "a close question exists" when the State does not present direct evidence about the defendant and victim's property interests in the residence where an aggravated burglary occurs. 308 Kan. at 1446. But circumstantial evidence can sufficiently support a factual conclusion that a defendant lacked authority to enter a residence. See 308 Kan. at 1446.

Forcible entry is a circumstance that can demonstrate a defendant lacked authority to enter. 308 Kan. at 1446. The *Williams* court reasoned:

13

"Here, the State presented circumstantial evidence that Robinson had to give permission in order for Williams to enter and that Williams recognized or acquiesced in her right to exclude him. Robinson testified that Williams did not live with her and she had taken back his key a few days before the incident. This suggests she had the right to give and revoke permission. Williams called and talked about dropping by, which suggests he did not perceive he had a right to demand access to the residence. And Robinson asked Williams not to come over on the night of the incident and refused to let him in when he knocked on her door. Significantly, Williams did not try to enter, even though the door was initially unlocked. Once Robinson answered the door, she told Williams to leave and then locked the door. When Williams returned, he broke the door open to gain entry—evidently he did not have a key.

"Based on this evidence, a rational fact-finder could conclude beyond a reasonable doubt that Williams entered the house without authority." 308 Kan. at 1446-47.

D.S. testified at trial that she ended her relationship with Gutierrez-Fuentes and had asked for his key. This suggests that D.S. had the right to give and revoke Gutierrez-Fuentes' permission to enter the apartment. Her testimony that Gutierrez-Fuentes came to the apartment to retrieve his belongings suggests that he recognized that right. D.S. further testified that on the day of the aggravated burglary, Gutierrez-Fuentes first came to the window of her apartment, knocked, and said he wanted to speak to her. This suggests that he realized he needed her permission to enter the apartment. Moreover, when D.S. did not let Gutierrez-Fuentes in, he forcibly broke the door open to gain entry, which, as noted in *Williams*, suggests he lacked authorization to enter.

Based on the evidence set forth above, a rational fact-finder could conclude beyond a reasonable doubt that Gutierrez-Fuentes entered the apartment without authority. This court finds the evidence was sufficient to support the verdict on this issue.

14

Gutierrez-Fuentes argues that the district court erred in admitting hearsay testimony from Myers and Hess about statements D.S. made to them through an interpreter. Under K.S.A. 2019 Supp. 60-460, "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible" unless it falls within certain delineated exceptions.

When Myers began to testify about his conversation with D.S.—as facilitated by an interpreter—Gutierrez-Fuentes objected on foundation and hearsay grounds, arguing that the State had not shown that the interpretation was accurate and that the interpreter, not Myers, should testify about the statements. The district court overruled the objection, holding: "It's hearsay, but it's based upon what she said and she will be testifying and you can clarify that at a later time. She is going to be testifying, so she will be available for cross-examination." As the district court implicitly recognized, K.S.A. 2019 Supp. 60-460(a) allows hearsay evidence if it is "[a] statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by the declarant while testifying as a witness." Nevertheless, the district court noted Gutierrez-Fuentes' request for a continuing objection.

Similarly, when the State asked Hess to testify about "what [D.S.] said was the reason for your consult with her," Gutierrez-Fuentes again objected on foundation and hearsay grounds. The district court overruled the objection and noted Gutierrez-Fuentes' request for a continuing objection. By objecting on hearsay grounds and obtaining a continuing objection, Gutierrez-Fuentes preserved this issue for appellate review. See

15

*State v. Mattox*, 305 Kan. 1015, 1035, 390 P.3d 514 (2017) (noting that a continuing objection to the admission of evidence preserves the issue for appellate review).

Gutierrez-Fuentes concedes that "because D.S. testified, D.S.'s actual statements would not be hearsay." He tries to distinguish his argument by contending that he does not challenge Myers' and Hess' testimony about D.S.'s statements; rather, he asserts that the inadmissible hearsay occurred when they testified about what the interpreter had told them. Gutierrez-Fuentes argues that because the unidentified interpreter was not available for cross-examination, Myers' and Hess' testimony about what the interpreter told them was inadmissible hearsay. He contends that the erroneous admission of hearsay requires reversal of his convictions and remand for a new trial. The State replies that the statements were not inadmissible hearsay and, even if the district court erred by allowing the testimony, any error was harmless.

As the parties agree, Kansas appellate courts "review a trial court's determination regarding whether hearsay is admissible under a statutory exception for an abuse of discretion." See *State v. Jones*, 306 Kan. 948, 957, 398 P.3d 856 (2017). A district court abuses its discretion by taking an action that is arbitrary, fanciful, or unreasonable; based on an error of law; or based on an error of fact. 306 Kan. at 957. Yet even if a district court errs by admitting inadmissible evidence, the result is not necessarily reversal of the defendant's convictions and remand for a new trial. See *State v. Sean*, 306 Kan. 963, 986, 399 P.3d 168 (2017) ("Even if we assume all of the testimony was erroneously admitted, our analysis below demonstrates its admission amounted to harmless error.").

The State directs this court to persuasive authority from the Georgia Court of Appeals regarding the admissibility of testimony from an interpreter as a "language conduit." See *Lopez v. State*, 281 Ga. App. 623, 636 S.E.2d 770 (2006). In *Lopez*, the interpreter did not testify at trial. The court allowed the testimony from the witness who

16

used the interpreter after finding that the overall circumstances showed the interpreter had no motive to distort the interpretation and it was otherwise accurate. That court ultimately held that the statements should be relied on as the declarant's statement themselves without an added layer of hearsay unless a motive to mislead or distort was present. 281 Ga. App. at 625-26.

The Kansas Supreme Court has not directly addressed the issue of whether or not a neutral third-party's interpreter's statements are inadmissible hearsay if the interpreter does not testify at trial. In discussing competency challenges to court-appointed interpreters, the Kansas Supreme Court discussed the role of the interpreter as more than a "mere witness" and commented that interpreters are presumed to have acted regularly in the performance of their official duty. See *State v. Van Pham*, 234 Kan. 649, 662, 675 P.2d 848 (1984). In *Van Pham*, the court explicitly complimented the district court on its procedural framework for handling objections to the court interpreter's interpretation outside the presence of the jury, stating that hearing variations or arguments on actual word meanings stated by the interpreter may confuse the jury. 234 Kan. at 665.

State and federal courts across the country are split on the language conduit rule, although a majority of jurisdictions have generally applied the rule favorably when addressing interpreted statements from a defendant. See *State v. Lopez-Ramos*, 929 N.W.2d 414, 420 (Minn. 2009) (holding that the interpreted statements are the statements of the declarant and not the interpreter). The Ninth Circuit upheld its prior adoption of the language conduit rule regarding interpreters after it was requested to review the rule under a Confrontation Clause analysis. See *U.S. v. Orm Hieng*, 679 F.3d 1131, 1140-1141 (9th Cir. 2012) (discussing *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 [2004]). In *Orm Hieng*, the defendant spoke in his native Cambodian language to a special agent of the United States Drug Enforcement Administration through the use of a Cambodian-English interpreter. Prior to the selection of the jury, the

17

question arose as to whether the interpreter, who was also serving as an interpreter during the trial, would need to be excluded from the courtroom with the other witnesses. The trial court concluded that "'the interpreter is obviously not a percipient or a fact witness to any of the events'" and allowed the interpreter to remain in the courtroom. 679 F.3d at 1137.

Under the language conduit rule, the *Orm Hieng* court found that a district court must consider all relevant factors, "'such as which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated.'" 679 F.3d at 1139. The Ninth Circuit found that by applying this threshold analysis to the interpreter, the matter stems from the law of evidence, divorced from the Sixth Amendment, regarding whether the interpreted statements are attributed directly to the original speaker or to the interpreter who literally utters the words. 679 F.3d at 1140. The defendant in *Orm Hieng* made no objection at trial and could not identify anything in the record that suggested the interpreter was anything other than a language conduit under the purview of the factors listed above. Accordingly, the interpreter's statements were not considered hearsay, and the interpreter was simply a language conduit. 679 F.3d at 1139.

Based on the Kansas Supreme Court's guidance in *Van Pham* that interpreters are more than mere witnesses and are presumed to have acted regularly in the performance of their duty, and that trial courts may handle challenges to the accuracy of an interpreter's interpretation outside the presence of a jury, this panel agrees with the state and federal courts that have favorably applied the language conduit rule. We thus adopt the language conduit rule that "'[e]xcept in unusual circumstances, an interpreter is "no more than a language conduit and therefore [the] translation"'" is viewed as the declarant's own. *United States v. Cordero*, 18 F.3d 1248, 1253 (5th Cir. 1994).

18

This panel must now consider all relevant factors to determine whether the interpreted statements were made by an interpreter acting simply as a language conduit of the victim.

In this case, the record reveals that the interpreter was supplied to the officer as an employee of the hospital. The record contains no evidence, or argument, of a motive to mislead by the interpreter. Furthermore, the statements interpreted to the officers were consistent with the testimony provided at trial, as discussed in more detail below. Accordingly, we find that the language conduit rule applies, and the statements of D.S. to officers through an interpreter should be attributed as D.S.'s direct statements without an additional layer of hearsay.

Gutierrez-Fuentes argues: "The district court improperly admitted evidence that falls squarely under the hearsay rule set out in K.S.A. 60-460. As a result, this court should reverse and remand for a new trial." The Kansas Supreme Court has held that "[e]rror in the admission of evidence that does not implicate a defendant's constitutional rights is harmless if there is no reasonable probability the error affected the trial's outcome in light of the entire record." *State v. Chapman*, 306 Kan. 266, 276, 392 P.3d 1285 (2017). The party benefitting from the error bears the burden to show harmlessness. 306 Kan. at 276. Courts may "simply mov[e] to harmlessness without deciding whether the [district] court erred" in admitting certain evidence if the harmlessness analysis is dispositive. See 306 Kan. at 277.

Although we have already found that admitting the evidence was not in error, even if error did exist, it was harmless. Gutierrez-Fuentes does not point to specific statements by Myers or Hess. Generally, the challenged portion of Myers' testimony was D.S. relating—through an interpreter—that she had broken up with Gutierrez-Fuentes on October 4, 2016, and then spent the night away from her apartment because she was

19

afraid Gutierrez-Fuentes would return and hurt her. D.S. said that she did not want Gutierrez-Fuentes in her apartment. D.S. said that after she returned to her apartment the next day, Gutierrez-Fuentes came into her apartment, told her he was going to kill her, and punched her several times in the face. She said that she was scared for her life and that Gutierrez-Fuentes stopped punching her when he heard someone outside the apartment.

Hess' testimony was similar and added details. Hess also testified that D.S. said—again, through an interpreter—that the Monday before the attack, Gutierrez-Fuentes had come to the apartment and D.S. had sex with him even though she did not want to. Hess said that D.S. also testified that before the day Gutierrez-Fuentes broke into the apartment, he had grabbed her by her neck and thrown her during an argument.

But all of the material facts related through Hess' or Myers' testimony that Gutierrez-Fuentes challenges as inadmissible hearsay came in through other, unchallenged witness testimony as well. Peña spoke directly with D.S.—without an interpreter—and Peña testified that D.S. told him about having sex with Gutierrez-Fuentes "against her will." Peña further testified that D.S. said that during an argument, Gutierrez-Fuentes "grabbed [D.S.] by the neck and threw her down on the couch." And he testified that D.S. told him that on October 5, 2016, Gutierrez-Fuentes "forced his way into her apartment" and hit her multiple times with his fist. Huhman, who spoke with D.S. using Peña as an interpreter, testified that D.S. told her "she felt like she was going to be killed" during the October 5 events. And D.S. also testified at length about these events.

Even if the district court had erred by allowing Myers and Hess to testify about statements from the interpreter that were attributed to D.S., in light of the entire record,

20

there is not a reasonable probability that Myers' and Hess' testimony affected the trial's outcome. So reversal is not warranted.

DID THE ELEMENTS INSTRUCTION FOR COUNT TWO ALLOW THE JURY TO CONVICT GUTIERREZ-FUENTES OF AGGRAVATED BURGLARY BASED ON UNCHARGED CONDUCT?

In his final issue, Gutierrez-Fuentes argues that the district court erred when it instructed the jury on the elements of aggravated battery as charged in count two.

With respect to count two, the amended information alleged in relevant part that Gutierrez-Fuentes "did then and there unlawfully and knowingly cause physical contact with another person, to-wit: DS, in a manner whereby great bodily harm, disfigurement or death could have been inflicted, to-wit: strangulation." But the district court instructed the jury on the charge in instruction number 7 that "[t]o establish this charge, each of the following claims must be proved: 1. The defendant knowingly caused bodily harm to D.S. in any manner whereby great bodily harm, disfigurement or death can be inflicted."

Gutierrez-Fuentes asserts that the district court committed reversible error by giving this instruction because it was broader than the operative information and thus it allowed the jury to convict him based on uncharged conduct. He asserts two ways in which the instruction was improperly broad. First, he contends that the jury instruction as given allowed his conviction if the State merely showed that he knowingly caused great bodily harm, rather than requiring the State to show that he caused physical contact in a rude, insulting, or angry manner and that this contact could have inflicted great bodily harm, as required under the statutory citation in the charging document. Second, he contends that the jury instruction as given allowed his conviction if the State merely showed he knowingly caused great bodily harm, rather than conforming to the charging

21

document's narrower assertion that he knowingly caused great bodily harm by strangulation.

The State replies that the invited error doctrine bars this claim and, in the alternative, that the argument fails on its merits. Gutierrez-Fuentes did not file a reply brief or otherwise respond to the State's invited error argument. And that argument resolves this issue—the invited error doctrine bars Gutierrez-Fuentes' challenge to jury instruction number 7.

Review of jury instructions is a multistep process, beginning with reviewability. Regarding this step, "'[w]hether the invited error doctrine applies is a question of law over which this court has unlimited review.'" *State v. Cottrell*, 310 Kan. 150, 161, 445 P.3d 1132 (2019). Further,

> "'the invited-error doctrine does not automatically apply every time a party requests an instruction at trial but then, on appeal, claims the district court erred by giving it. Instead, appellate courts must engage in a searching analysis of the facts of the case to determine whether the complaining party truly invited the error.'
>
> "There is no 'bright-line rule' for applying the invited error doctrine, and context matters. On the one hand, 'the mere failure to object to a proposed instruction at the instructions conference does not trigger the doctrine.' 'On the other hand, when a defendant actively pursues what is later argued to be an error, then the doctrine most certainly applies.' The fact that a defendant submitted a proposed instruction before trial does not prevent applying the invited error doctrine if the error 'was as obvious before trial as after trial.' [Citations omitted.]" 310 Kan. at 162.

In this case, Gutierrez-Fuentes submitted his proposed jury instructions on August 17, 2018, four days before the jury trial began. For count two, he proposed a jury instruction that did not include the language Gutierrez-Fuentes now asserts should have

22

been in the instruction as given. Moreover, during the jury instruction conference on the final day of the trial defense counsel stated that he had "no objection" to instruction number 7.

As the State points out in its brief, this case is materially indistinguishable from *State v. Fleming*, 308 Kan. 689, 423 P.3d 506 (2018). Because *Fleming* also addressed the invited error doctrine's application to a jury instruction that was broader than the charging document, its analysis controls this case. See *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014) (holding that the Court of Appeals must follow Kansas Supreme Court precedent absent some indication that the Kansas Supreme Court intends to depart from that position).

In *Fleming*, the charging document specified that the aggravated robbery charge was based on the taking of a cell phone and a wallet from the victim's presence, while the theft charge was based on the taking of a television, a PlayStation, a laptop computer, and watches. But the jury instruction ultimately given on aggravated robbery did not specifically identify the taken property on which the charge rested. After his conviction for aggravated robbery, Fleming challenged the instruction on appeal, arguing that it was "broader than the charge set out in the complaint against him." 308 Kan. at 691.

Like Gutierrez-Fuentes, the proposed jury instruction Fleming submitted to the district court did not mirror the charging document. It removed the language specifying that Fleming took "'property, to-wit: cell phone, wallet'" and stated only that Fleming took "'property from the presence of'" his victim. 308 Kan. at 691-92. The State's proposed jury instruction and the district court's instruction—to which Fleming did not object—also used the term "property" and did not identify the specific property taken. 308 Kan. at 692.

23

On appeal, the Kansas Supreme Court agreed with Fleming that a defendant submitting proposed jury instructions at pretrial that included an instruction later given by the district court did not always bar an appellate challenge to that instruction. 308 Kan. at 701-02. Rather, the determining factor is "the nature of the error." 308 Kan. at 702. For example, an alternative means challenge to a jury instruction could not be invited error by a defendant's pretrial proposed jury instructions "'because the trial had not yet occurred'" when the defendant proposed the instruction. 308 Kan. at 702. In other words, "'counsel could not appreciate before trial that the instruction would be overbroad—as measured by the State's evidence—until that evidence was submitted.'" 308 Kan. at 702. But when "'a lawyer submits a pretrial instruction on the elements of an offense that defines the offense more expansively than it is charged by the State,'" the invited error doctrine applies because the expansion of the crime as charged is "as obvious before trial as after trial." 308 Kan. at 702-03. Thus, "'[t]he defendant's actions in causing the alleged error and the context in which those actions occurred must be carefully reviewed in deciding whether to trigger this doctrine.'" 308 Kan. at 701.

Turning to the facts of the case before it, the Kansas Supreme Court noted that the charging document was clear that the aggravated burglary charge was based on the taking of only two items, and

> "Fleming's counsel had notice of the particular facts the State alleged supported its case and that those facts could be of particular significance to different charges brought. Yet Fleming's counsel proposed an instruction that used the pattern language rather than proposing a modification limiting the jury's consideration to the specific property alleged [in the complaint] and did not at any later point object or request a modification. [Citation omitted.]" 308 Kan. at 707.

Under these circumstances, the *Fleming* court held that "invited error precludes our review of Fleming's asserted jury instruction error on these facts." 308 Kan. at 707.

24

Similarly, when Gutierrez-Fuentes' counsel submitted the proposed instruction to the district court, he was aware of the particular facts on which the charges rested and the theory of aggravated battery upon which he was charged. Yet his proposed instruction used language broader than that in the charging document and did not include the language which Gutierrez-Fuentes now asserts was required. Furthermore, Gutierrez-Fuentes did not request that the district court modify the jury instruction to better align it with the charging document at the jury instruction conference. Thus, under *Fleming*, the invited error doctrine applies and bars Gutierrez-Fuentes' claim that the jury instruction requires reversal.

For the reasons stated above, the decision of the district court is affirmed.